**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**

| | | |
|---|---|---|
| AMERICAN WHITEWATER, and AMERICAN RIVERS | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civil Case No. _____ |
| THE UNITED STATES ARMY CORPS OF ENGINEERS, THE UNITED STATES FOREST SERVICE, and THE UNITED STATES FISH AND WILDLIFE SERVICE, | ) ) ) ) ) | **COMPLAINT** |
| Defendants. | ) ) ) ) ) | |

## INTRODUCTION

1.     This case challenges unlawful approvals issued by the United States Army Corps of Engineers ("Army Corps") and United States Forest Service, and an unlawful determination made by the United States Fish and Wildlife Service, authorizing CSX Transportation ("CSX") to engage in unmitigated, extremely damaging railroad construction work in the Nolichucky River Gorge (or "the Gorge") in North Carolina and Tennessee.

2.     The Nolichucky River Gorge is one of the deepest and most spectacular river gorges left in the Southeast. Land and waters in the Gorge are largely managed by the United States Forest Service. Congress has directed that the Nolichucky River be studied for inclusion in the Wild and Scenic River System, and after studying it, the Forest Service recommended the Gorge as suitable for full and permanent protection in that System. The Gorge hosts a thriving whitewater paddling industry which is important to the economy of Unicoi County, Tennessee.

The Gorge is home to numerous iconic species, including bald eagles, brook trout, and hellbenders, as well as species protected under the Endangered Species Act.

3. In late September 2024, the Gorge experienced catastrophic flooding in connection with Hurricane Helene. The flooding destroyed significant parts of a rail line owned by CSX that traversed the Gorge. Cargo that would have used that rail line is now being rerouted around the Gorge.

4. Sometime after the storm passed, CSX began operating heavy machinery in the Gorge and in the Nolichucky River itself to rebuild its railroad in its previous location even though large sections of land where the railroad once stood are now gone. In the process, CSX has been mining rock and other materials from the Nolichucky River riverbed and piling it up near the riverbank to rebuild land washed away by Hurricane Helene. CSX started its work without informing federal agency defendants with jurisdiction over activities in the Gorge but those agencies have now issued authorizations and determinations approving the work and allowing it to proceed. The work is inflicting significant damage on the Gorge, ruining its unmatched values, and increasing downstream risk from future floods.

5. The work is also unlawful. The Army Corps has issued approvals authorizing work to proceed that does not comply with the Rivers and Harbors Act of 1899 ("Rivers and Harbors Act") and Clean Water Act. The Forest Service has authorized work to proceed in the absence of special-use permits required under the Forest Service's Organic Act and National Forest Management Act. The Army Corps and Forest Service authorizations both fail to comply with the National Environmental Policy Act. And the Fish and Wildlife Serice's determination that its exercise of emergency Section 7 consultation under the Endangered Species Act ("ESA") will comply with core tenets of that statute is arbitrary and capricious. All three agencies rely on

emergency *procedures* to justify their actions but those procedures do not and cannot waive *substantive* legal requirements—if anything, they must expedite compliance with those substantive requirements.

6.      Plaintiffs support expeditiously rebuilding CSX's railroad through the Gorge. This litigation is not an attempt to prevent or unnecessarily slow reconstruction. Plaintiffs have repeatedly asked CSX to use alternative methods that would not involve mining the riverbed, but CSX has expressly refused those requests. Plaintiffs have also repeatedly asked the relevant federal agencies to put protections in place to ensure the Gorge is not unnecessarily damaged while allowing reconstruction to proceed. Those agencies have also refused to put those legally required protections in place. Because work continues unmitigated, causing irreparable impacts, Plaintiffs are left with no choice but to initiate litigation to preserve the Gorge's exceptional values.

7.      Specifically, American Whitewater and American Rivers seek a declaration that (1) the U.S. Army Corps of Engineers' authorizations violate the Rivers and Harbors Act, Clean Water Act, National Environmental Policy Act, and Administrative Procedure Act; (2) the U.S. Forest Service's authorizations, or, in the alternative, lack of authorizations, violate the Forest Service Organic Act, National Forest Management Act, National Environmental Policy Act, and Administrative Procedure Act; and (3) the U.S. Fish and Wildlife Service's determination that its exercise of emergency Section 7 consultation procedures complies with the ESA violates that statute and the Administrative Procedure Act ("APA"). American Whitewater and American Rivers request that the Court vacate the agency authorizations and determinations at issue and immediately enjoin the agencies from relying on them until they complete permitting and authorization procedures that comply with the law.

## JURISDICTION AND VENUE

8.     This action arises under the Rivers and Harbors Act of 1899, 33 U.S.C. § 400 *et seq.*, Clean Water Act, 33 U.S.C. § 1251 *et seq.*, Forest Service Organic Act, 16 U.S.C. § 551 *et seq.*, National Forest Management Act, 16 U.S.C. § 1600, *et seq.*, National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331 *et seq.*, Endangered Species Act, 16 U.S.C. § 1531 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. §§ 701–06.

9.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1346(a)(2) (United States as defendant), and 5 U.S.C. § 702 (APA judicial review). This Court may issue a declaratory judgment and further relief requested pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

10.    Plaintiffs challenge authorizations issued by the Army Corps of Engineers and Forest Service, and a determination issued by the Fish and Wildlife Service. CSX is relying on these authorizations and determinations to move forward with work in the Gorge. These authorizations and determinations are final agency actions within the meaning of the APA and accordingly are judicially reviewable under § 704 of that act. *See* 5 U.S.C. § 551(13) (defining "agency action" for purposes of APA review).

11.    Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(B) because Defendants are agencies, officers, or employees of the United States acting in their official capacities, and a substantial part of the events or omissions giving rise to the claims occurred in the District. Venue is also proper in this District under 28 U.S.C. § 1391(e)(1)(C) because plaintiff American Whitewater is headquartered in the District.

## PARTIES

### Plaintiffs

### American Whitewater

12.     American Whitewater is a nonprofit organization founded in 1954 that works to protect and restore America's whitewater rivers and to enhance opportunities to enjoy them safely. American Whitewater has long prioritized protection of the Nolichucky River which is one of the most pristine whitewater rivers in the Southeast. American Whitewater has invested significant time and resources advocating for protection of the Nolichucky River Gorge through forest plan revision processes and Wild and Scenic River designations, among other things.

13.     Members and staff of American Whitewater, including Kevin Colburn, frequently recreate on the Nolichucky River. Members also operate whitewater outfitter businesses in the Nolichucky River Gorge. American Whitewater staff members have heard concerns from numerous members who are worried about the effect of CSX's ongoing work on the Nolichucky Gorge. CSX's ongoing work adversely affects the recreational, business, and aesthetic interests of American Whitewater and its members. These harms are significant and irreparable as changes to the navigability and environmental conditions in the Gorge cannot be undone.

### American Rivers

14.     American Rivers is a nonprofit organization founded in 1973 that works to protect wild rivers like the Nolichucky River and restore damaged ones. American Rivers believes life depends on rivers and advocates for improvements in overall river health, protection of biodiversity, and access to clean drinking water. American Rivers has invested time and resources in efforts to have the Nolichucky River designated by Congress as a Wild and Scenic River since at least the 1990s.

5

15.     American Rivers and staff members, including Erin McCombs, use the Nolichucky River and value it for its scenic, recreational, and ecological qualities. Ms. McCombs has gone snorkeling in the river to look for aquatic species in areas now impacted by CSX's construction activities. CSX's activities will likely prevent Ms. McCombs from visiting these areas in the future to snorkel and look for fish, mussels, and other animals. CSX's ongoing work adversely affects the recreational, professional, and aesthetic interests of American Rivers, its staff, and supporters including Ms. McCombs. These harms are significant and irreparable as harm to aquatic life and the Nolichucky's Wild and Scenic River values cannot be erased.

## Defendants

### United States Army Corps of Engineers

16.     Defendant United States Army Corps of Engineers is a federal agency within the United States Department of Defense. The Army Corps is charged with administering permits under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act.

17.     Agency approvals authorizing CSX to work in the Nolichucky Gorge were issued by the Army Corps' Nashville, Tennessee, and Wilmington, North Carolina Districts. The Nashville District has jurisdiction over work in Tennessee and the Wilmington District has jurisdiction over work in North Carolina.

### United States Forest Service

18.     Defendant United States Forest Service is a federal agency within the United States Department of Agriculture. The Forest Service is charged with stewarding the Pisgah National Forest in North Carolina and Cherokee National Forest in Tennessee.

19.     The Forest Service is responsible for issuing special-use permits authorizing private activities on national forest system lands, including activities conducted by CSX in the

Pisgah and Cherokee National Forests. The Forest Service is also responsible for ensuring that its actions—including regulation of private activities as special uses—comply with governing Land and Resource Management Plans ("forest plans") for the Pisgah and Cherokee National Forests, respectively. Finally, the Forest Service is charged with managing the Nolichucky River to maintain its values as a study river under the Wild and Scenic Rivers Act.

20.     Upon information and belief, agency approvals authorizing CSX to work in the Nolichucky Gorge were issued by the Cherokee National Forest and Pisgah National Forest, respectively.

21.     Alternatively, the Cherokee National Forest and Pisgah National Forest have failed to provide required agency approvals authorizing CSX's work.

**United States Fish and Wildlife Service**

22.     Defendant United States Fish and Wildlife Service is a federal agency within the Department of the Interior. The Fish and Wildlife Service is responsible for administering the provisions of the ESA for listed terrestrial and freshwater species, including the endangered species present in the Nolichucky River Gorge.

23.     The Fish and Wildlife Service is exercising emergency Section 7 consultation procedures in connection with work ongoing in the Gorge that will harm listed species and their habitats.

**LEGAL BACKGROUND**

**Rivers and Harbors Act of 1899**

24.     The Rivers and Harbors Act prohibits the "creation of any obstruction . . . to the navigable capacity of any of the waters of the United States . . . except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army." 33 U.S.C. § 403. It also

makes it unlawful "to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of . . . the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same." *Id*.

25.     Under the Rivers and Harbors Act, "navigable waters of the United States . . . are those waters of the United States that . . . are presently used, or have been used in the past, or may be susceptible to use to transport interstate or foreign commerce." 33 C.F.R. § 322.2(a). "[T]he presence of recreational craft may indicate that a waterbody is capable of bearing some forms of commerce, either presently, in the future, or at a past point in time." *Id*. § 329.6(a); *see United States v. Abbott*, No. 1:23-CV-853-DAE, 2024 WL 1832236, at *7 (W.D. Tex. Apr. 26, 2024) (finding at the motion to dismiss stage that a photograph of "a boat navigating this stretch of the river shows the stretch is susceptible of use in interstate or international commerce").

26.     The term "work" includes "without limitation, any dredging or disposal of dredged material, excavation, filling, or other modification of a navigable water of the United States." *Id*. § 322.2(c).

27.     "[W]ork in or affecting navigable waters of the United States" requires a permit under Section 10 of the Rivers and Harbors Act. 33 C.F.R. § 322.3(a); 33 U.S.C. § 403. Work outside of navigable waters is still subject to a Section 10 permit if it "affect[s] the course, location, or condition of the waterbody in such a manner as to impact its navigable capacity." 33 C.F.R. § 322.3(a).

28.     Permitting under Section 10 requires substantive review by the Army Corps. *See* 33 C.F.R. §§ 322.1 (incorporating 33 C.F.R. Part 320) and 320.4 (describing review requirements to protect water quality, wildlife, recreation, and navigation). In this review

process, "resource losses" to environmental quality "will be avoided to the extent practicable" through mitigation measures. *Id*. § 320.4(r).

29. In limited circumstances, the Army Corps can issue a Section 10 permit using "emergency procedures." 33 C.F.R. §§ 325.1, 325.2(e)(4). Under those procedures, an emergency "is a situation which would result in an unacceptable hazard to life, a significant loss of property, or an immediate, unforeseen, and significant economic hardship if corrective action requiring a permit is not undertaken within a time period less than the normal time needed to process the application under standard procedures." *Id*. § 325.2(e)(4). "Even in an emergency situation, reasonable efforts will be made to receive comments from interested Federal, state, and local agencies and the affected public." *Id*.

## Clean Water Act

30. The Clean Water Act was enacted in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

31. Congress pursued those goals, in part, through a permitting scheme. Congress prohibited the discharge of "dredged or fill material into the navigable waters" without a permit, 33 U.S.C. §§ 1311, 1344, but gave the "Secretary of the Army, acting through the Chief of Engineers," *id.* § 1344(d), authority to "issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites," *id.* § 1344(a). These permits are generally known as Section 404 permits.

32. For purposes of Section 404, "dredged material" is defined as "material that is excavated or dredged from waters of the United States." 33 C.F.R. § 323.2(c). "Fill material" is defined as "material placed in waters of the United States where the material has the effect of: (i) Replacing any portion of a water of the United States with dry land; or (ii) Changing the bottom elevation of any portion of a water of the United States." *Id*. § 323.2(e)(1).

33.     "The term discharge of fill material means the addition of fill material into waters of the United States. The term generally includes, without limitation, the following activities: Placement of fill that is necessary for the construction of any structure or infrastructure in a water of the United States; the building of any structure, infrastructure, or impoundment requiring rock, sand, dirt, or other material for its construction; site-development fills for recreational, industrial, commercial, residential, or other uses; causeways or road fills; . . . [and] property protection and/or reclamation devices such as riprap, groins, seawalls, breakwaters, and revetments . . ." 33 C.F.R. § 323.2(f).

34.     The Army Corps has promulgated specific procedures to obtain a Section 404 permit. *See* 33 C.F.R. §§ 325.1, 325.2. These procedures ensure compliance with other laws, *see, e.g.*, *id.* § 325.1(b) (coordinating compliance with NEPA), and facilitate the Army Corps' public interest review, *see id.* § 320.4(a)(1) ("The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest.").

35.     Issuing a Section 404 permit also requires compliance with Section 404(b)(1) guidelines issued jointly by the Army Corps and the U.S. Environmental Protection Agency. 33 U.S.C. § 1344(e)(1); 40 C.F.R. § 230.7(b). Under those guidelines, "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a).

36.     Like Section 10 permits, in limited circumstances the Army Corps can issue a Section 404 permit using "emergency procedures." 33 C.F.R. § 325.2(e)(4). Under those procedures, an emergency "is a situation which would result in an unacceptable hazard to life, a

significant loss of property, or an immediate, unforeseen, and significant economic hardship if corrective action requiring a permit is not undertaken within a time period less than the normal time needed to process the application under standard procedures." *Id*. "Even in an emergency situation, reasonable efforts will be made to receive comments from interested Federal, state, and local agencies and the affected public." *Id*.

37.     Some "maintenance" actions can also be exempted from Section 404 permitting requirements. Specifically, a Section 404 permit is not required "for the purpose of maintenance, including emergency reconstruction of recently damaged parts, of currently serviceable structures such as dikes, dams, levees, groins, riprap, breakwaters, causeways, and bridge abutments or approaches, and transportation structures." 33 U.S.C. § 1344(f)(1)(B). This exemption may not be used for "any modification that changes the character, scope, or size of the original fill design." 33 C.F.R. § 323.4(a)(2).

38.     Elsewhere, the Army Corps defines "currently serviceable" as "[u]seable as is or with some maintenance, but not so degraded as to essentially require reconstruction." Army Corps, Nationwide Permits Final Rule, 86 Fed. Reg. 2,744, 2,875 (Jan. 13, 2021); *see Swinomish Indian Tribal Cmty. v. Skagit Cnty. Dike Dist. No. 22*, 618 F. Supp. 2d 1262, 1268 (W.D. Wash. 2008) ("Under the plain meaning of the phrase, 'currently serviceable' must mean that a structure is performing its function to some degree.").

## Forest Service Organic Act and National Forest Management Act

39.     Under the Forest Service Organic Act, the "Secretary of Agriculture shall make provisions for the protection against destruction by fire and depredations upon the public forests and national forests." 16 U.S.C. § 551.

40. Pursuant to that authority, the Secretary of Agriculture has designated all "uses of National Forest System lands, improvements, and resources, except those authorized" under irrelevant exceptions as "special uses." 36 C.F.R. § 251.50(a). "Before conducting a special use, individuals or entities must submit a proposal to the authorized officer and must obtain a special use authorization from the authorized officer." *Id*.

41. "Each special use authorization must contain . . . [t]erms and conditions which will: . . . (A) Carry out the purposes of applicable statutes and rules and regulations issued thereunder; (B) Minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment; (C) Require compliance with applicable air and water quality standards established by or pursuant to applicable Federal or State law; and (D) Require compliance with State standards for public health and safety, environmental protection, and siting, construction, operation, and maintenance if those standards are more stringent than applicable Federal standards." 36 C.F.R. § 251.56(a)(1).

42. Temporary occupancy of national forest system lands can occur "when necessary for the protection of life and property in emergencies" without a special-use permit but only "if a special use authorization is applied for and obtained at the earliest opportunity." 36 C.F.R. § 251.50(b). The Forest Service has the authority to "require changes" to an ongoing use or occupancy that began during an emergency as "necessary or appropriate." *Id.*

43. Issuance of a special-use permit requires a permit application, screening, NEPA analysis and documentation, and determination of whether the proposal is consistent with the governing forest plan. *See* 36 C.F.R. § 251.54 (providing requirements to obtain a special-use permit).

12

44. Related to this last requirement, the National Forest Management Act requires the Forest Service to "develop, maintain, and, as appropriate, revise [forest plans] for units of the National Forest System." 16 U.S.C. § 1604(a).

45. All "instruments for the use and occupancy of National Forest System lands" including special use permits "shall be consistent with the [forest plans]." *Id*. § 1604(i). Special uses which are inconsistent with forest plans may not be approved. *See id*.; 36 C.F.R. § 219.15(c).

46. The Forest Plan for the Cherokee National Forest requires that activities in the Nolichucky Wild and Scenic River corridor must protect "high" scenic integrity objectives. Cherokee National Forest Revised Land and Resource Management Plan (2004) at 86–89. In these areas, "[h]uman activities are not visually evident to the casual observer. Activities may only repeat attributes of form, line, color, and texture found in the existing landscape character." *Id*. at 311. Special uses are allowed only "when consistent and compatible with protections of the outstandingly remarkable values of the river corridor." *Id*. at 85.

47. The Forest Plan for the Pisgah National Forest requires that the "outstandingly remarkable values" of the Nolichucky River Gorge—specifically scenery, geology, and fish— must be maintained. Nantahala-Pisgah National Forests Land Management Plan (2023) at 257, 259. Any "man-made structures that impede the flow of the river are prohibited." *Id*. at 260. Further, the land management plan requires that "[t]he river and its channel are not modified except for riparian or habitat improvements," *id*. at 261, and "linear facilities" in river corridors must be confined to "existing rights of way," *id*. at 262. The Pisgah Forest Plan also requires that in "areas occupied by federally listed species and species of conservation concern, management

shall maintain characteristics required by these species, where necessary for their recovery and/or persistence." *Id.* at 80.

## National Environmental Policy Act

48.     NEPA was enacted in 1969 "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. The statute has twin aims: "First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (internal citation and quotation marks omitted).

49.     NEPA's objectives are "realized through a set of action-forcing procedures that require that agencies take a hard look at environmental consequences, . . . and [] provide for broad dissemination of relevant environmental information." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citation and quotations omitted).

50.     These action-forcing procedures require agencies to complete certain requirements for "every . . . proposal[] [for] major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

51.     If an agency concludes that a proposal for major federal action is "likely to have significant effects," it must prepare an Environmental Impact Statement ("EIS"). 40 C.F.R. § 1501.3(c)(3). If the need for an EIS is unclear—i.e., if it is uncertain whether the major federal action will significantly affect the quality of the human environment—an agency may first prepare an Environmental Assessment ("EA"). *Id.* § 1501.5(a).

14

52. "Where emergency circumstances make it necessary to take an action with significant effects without observing the provisions of [NEPA], the Federal agency taking the action shall consult with the [Council on Environmental Quality] about alternative arrangements for compliance with section 102(2)(C) of NEPA." 40 C.F.R. § 1506.11. "Agencies and the [Council on Environmental Quality] shall limit such arrangements to actions necessary to control the immediate impacts of the emergency; other actions remain subject to NEPA review consistent with this subchapter." *Id*.

### Endangered Species Act

53. As explained by the Supreme Court, the "plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978).

54. "To that end, the Endangered Species Act requires federal agencies 'to afford first priority to the declared national policy of saving endangered [or threatened] species'—even when this goal conflicts with agencies' 'primary missions.'" *Appalachian Voices v. U.S. Dep't of Interior*, 25 F.4th 259, 264 (4th Cir. 2022) (quoting *Tenn. Valley Auth.*, 437 U.S. at 185).

55. This goal is codified in ESA Section 7(a)(2), which commands each federal agency to ensure "that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2).That determination is made through the Section 7 consultation process.

56. "'Jeopardize the continued existence of' means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both

the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

57.     Recovery is defined as "improvement in the status of listed species to the point at which listing is no longer appropriate." *Id.*

58.     "Destruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." *Id.*

59.     To police the substantive duty to avoid jeopardizing listed species and destroying or adversely modifying critical habitat, the ESA and its implementing regulations set out a detailed consultation process to assess the effects of proposed agency actions. *Id.*; 50 C.F.R. § 402. Ordinarily, this process contains three major steps.

60.     First, a federal agency proposing to take some action—termed the "action agency"—must request information from the "consulting agency"—here, the Fish and Wildlife Service—concerning whether any species that has been listed as endangered or threatened (or is proposed to be listed) is present in the "action area." 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(c).

61.     Second, if the Fish and Wildlife Service determines that listed species may be present, the action agency must then determine whether the "action may affect listed species or critical habitat." *Id.* § 402.14(a). "*Any possible effect*, whether beneficial, benign, adverse, or of an undetermined character," satisfies the "may affect" standard. *California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1018–19 (9th Cir. 2009) (emphasis original) (quoting Interagency Cooperation—Endangered Species Act of 1973, as Amended, 51 Fed. Reg. 19,926, 19,949 (June 3, 1986) (final rule)).

16

62.     Third, if the action may affect a listed species or critical habitat, the action agency must engage in "formal consultation" with the Fish and Wildlife Service, 50 C.F.R. § 402.14(a), unless the action agency further determines, with the written concurrence of the consulting agency, "that the proposed action is not likely to *adversely* affect any listed species or critical habitat," *id.* § 402.14(b)(1) (emphasis added).

63.     Formal consultation concludes with a biological opinion finding that the action is either "[l]ikely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat" or not. 50 C.F.R. § 402.14(h)(1)(iv). If jeopardy or destruction/adverse modification of critical habitat is likely, the action may not move forward as proposed. *See* 16 U.S.C. § 1536(a)(2). If the Fish and Wildlife Service concludes that the action is not likely to result in jeopardy or destruction/adverse modification but may result in the "incidental take of listed species"—generally defined as the harassment, harming, wounding, or killing of a listed species that results from, but is "not the purpose of," an "otherwise lawful activity," 16 U.S.C. § 1532(19), 50 C.F.R. § 402.02—then it generally must provide an "incidental take statement" with the biological opinion limiting the amount of "take" that can occur, 50 C.F.R. § 402.14(i)(1).

64.     "Where emergency circumstances mandate the need to consult in an expedited manner, consultation may be conducted informally through alternative procedures." 50 C.F.R. § 402.05(a). But "[f]ormal consultation shall be initiated as soon as practicable after the emergency is under control." *Id*. § 402.05(b). Importantly, FWS must make a determination that any "alternative procedures" are "consistent with the requirements of sections 7(a)–(d) of the [ESA]." *Id*. § 402.05(a); *see Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv*., 397 F. Supp. 2d 1241, 1256 (D. Mont. 2005) ("The emergency provision of § 402.05 allows for

informal consultation when there is a need to consult in an expedited manner; this informal consultation still must be consistent with the directives of sections 7(a)-(d) of the Act.") (cleaned up). The Fish and Wildlife Service's initial review during emergency Section 7 consultation procedures should include an analysis of jeopardy and adverse modification of critical habitat. *See* Fish and Wildlife Service and National Marine Fisheries Service, Endangered Species Act Consultation Handbook, 8-1 (1998).

65.     As noted above, Section 7(a) of the ESA requires federal agencies to ensure "that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2).

66.     Section 7(b) of the ESA requires FWS to produce a biological opinion which "shall suggest those reasonable and prudent alternatives" to avoid jeopardy or destruction or adverse modification of critical habitat if necessary; or alternatively, "specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact" that does not rise to the level of jeopardy or adverse modification of critical habitat. *See* 16 U.S.C. § 1536(b).

67.     Section 7(c) of the ESA requires the use of "the best scientific and commercial data available" during Section 7 consultation, among other things. *See* 16 U.S.C. § 1536(c).

68.     Section 7(d) of the ESA prohibits "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures" that would avoid jeopardy or adverse modification while Section 7 consultation is ongoing. *See* 16 U.S.C. § 1536(d).

## Administrative Procedure Act

69. The APA creates a right to judicial review for any person wronged or aggrieved by a final agency action when there is no other adequate remedy available. 5 U.S.C. §§ 702, 704.

70. "Agency action" "includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). This definition "is meant to cover comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001).

71. Whether an agency action constitutes final agency action "is a pragmatic and flexible" inquiry, *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1279 (D.C. Cir. 2005) (cleaned up), that turns on two factors.

72. First, "the action must mark the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Second, "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id*. at 178 (cleaned up).

73. Under the APA, a reviewing court shall "hold unlawful and set aside agency action[s], findings, and conclusions" that the court finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law." 5 U.S.C. § 706(2).

74. Agency action is arbitrary and capricious, and must be set aside, where, among other things: the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so

implausible that it could not be ascribed to a difference in view or the product of agency expertise" or where the agency's action is not based on a "reasoned analysis." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43 (1983).

75.     The APA also provides relief to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

## FACTUAL BACKGROUND

### Nolichucky River Gorge

76.     The Nolichucky River flows approximately 100 miles from the confluence of the North Toe and Cane Rivers near Huntdale, North Carolina, before emptying into Douglas Lake, Tennessee.

77.     The heart of the river system is the majestic Nolichucky Gorge—an approximately 7.2-mile section of river that flows through one of the deepest gorges in the Southeast. The river flows through the Gorge from North Carolina across the state line into Tennessee, with land on the North Carolina side under the jurisdiction of the Pisgah National Forest and land on the Tennessee side under the jurisdiction of the Cherokee National Forest.

78.     As described by the Forest Service, the Nolichucky Gorge is "one of the deepest, most spectacular gorges in the eastern United States," where "forest-covered slopes rise to more than 2,000 feet adjacent to the river." U.S. Forest Service, Wild and Scenic River Study Report and Final Environmental Impact Statement on the Nolichucky River, iii (1994).

79.     Congress designated the Nolichucky River as a potential Wild and Scenic River in 1975, to be further studied for potential inclusion in the Wild and Scenic River system. P.L. 93-621 (Jan. 3, 1975) (amending 16 U.S.C. § 1276).

80.     In 1994, the Forest Service formally recommended that the Gorge section of the river be designated by Congress as a Wild and Scenic River. Congress has not yet acted on this recommendation and the river remains a Congressionally designated Wild and Scenic "study" river.

81.     The Gorge is home to a thriving whitewater industry based out of Erwin, Tennessee. Outdoor recreation tourism—including the whitewater rafting industry based on the Nolichucky River—generates $17 million annually for Unicoi County, Tennessee. The Gorge is also important to anglers, hikers, and other recreators.

82.     The wild nature of the Gorge makes it ideal habitat for numerous game and non-game species, including black bear, deer, bald eagles, smallmouth bass, brook trout, and rare Eastern Hellbenders—the largest salamanders in North America. The Gorge is also home to species protected under the ESA. *Virginia spiraea*—a threatened plant—can be found along the Nolichucky's riverbanks. And the Appalachian elktoe—an endangered mussel—can be found beneath its waters.

83.     *Virginia spiraea* "is restricted to a narrow ecological niche"—it exists only "along scoured banks" of streams and rivers. Fish and Wildlife Service, Final Rule Listing *Virginia Spiraea* as Threatened, 55 Fed. Reg. 24,241 (June 15, 1990). Human disturbance is the primary threat to the species. *Id*. at 24,244.

84.     Appalachian elktoe is known from only a handful of locations, and it is restricted to scattered pockets of suitable habitat. *See* Fish and Wildlife Service, Final Rule Designating Critical Habitat for Appalachian elktoe, 67 Fed. Reg. 61,016, 61,017 (Sept. 27, 2002). It requires "stable, relatively silt-free, coarse sand and gravel substrate associated with cobble, boulders, and/or bedrock." *Id*. "Stability of the substrate appears to be critical to the Appalachian elktoe."

*Id*. Habitat loss and alteration due to "channelization[] and dredging operations" are known threats to the species. *Id*. at 61,018.

85.     The Appalachian elktoe is known to occur in the Nolichucky River, and that population has been recovering over time because of improvements attributed to the Clean Water Act. *Id*. at 61,021. The Nolichucky River has also been designated by the Fish and Wildlife Service as critical habitat for Appalachia elktoe where it flows through the Gorge. 67 Fed. Reg. 61,016, 61,028–29 (Sep. 27, 2002). The Fish and Wildlife Service's 2022 Status Review for Appalachian elktoe found that the entire Gorge was "occupied habitat." Fish and Wildlife Service, Appalachian elktoe Status Review, 11 (2022).

86.     The Nolichucky River Gorge is undeveloped except for a railroad owned by CSX. Upon information and belief, the railroad occupies a right-of-way over national forest system lands that extends 50 feet on either side of the track's center line. Until Hurricane Helene, the railroad was largely screened by vegetation from the river, providing Gorge visitors spectacular scenery.

## Hurricane Helene and CSX's Response

87.     On September 27, 2024, the Nolichucky River and its major tributaries experienced catastrophic flooding caused by heavy rainfall associated with Hurricane Helene. The flooding caused historic damage in the Nolichucky Gorge including by displacing large sections of CSX's railroad track, washing away land beneath the track, and destroying a bridge used by the railway.

88.     CSX's railroad through the Nolichucky Gorge has been unable to accommodate train traffic since at least September 27, 2024.

89.     Portions of CSX's railroad require full reconstruction.

90. Upon information and belief, it will take months to reconstruct CSX's railroad so it is fully open to train traffic through the Nolichucky Gorge.

91. Upon information and belief, cargo that would have been shipped through the Nolichucky Gorge on trains is currently being rerouted around the Gorge to reach its intended destination.

92. The current absence of rail transportation through the Nolichucky Gorge is not causing an immediate threat to life or property.

93. In recent weeks, CSX and/or its contractors have started rebuilding CSX's rail line generally in its previous location through the Nolichucky Gorge. Documents produced through the Freedom of Information Act indicate that CSX began its reconstruction activities without informing the Army Corps, Forest Service, or Fish and Wildlife Service.

94. Putting the rail line back in its previous location involves the placement of "fill" material in the riverbed and other tributaries to elevate the rail line where the old track and the land beneath it were washed away.

95. The photograph below shows CSX discharging fill and installing a new bridge after Helene where Hollow Poplar Creek flows into the Nolichucky River. As noted in the photograph, the fill and bridge are preventing fish passage into the creek:



Poplar Creek Bridge (Fish Barrier)

96.     CSX and/or its contractors have also constructed at least one haul road across the river in order to excavate rock and soil from the side of the river without the railroad and drive it across the river to be used as fill to reconstruct the railroad. This "road" is not dry land but has elevated the river bottom enough so that CSX can get its machinery across the river. The "road" is shown in the photograph below:



97. Upon information and belief, the majority of this fill material is being obtained by excavating rock and sediments from the river itself, including the riverbed, cobble bars, and bedrock, and from the river's banks. Excavation in the river channel and banks is being conducted both below and above the ordinary high water mark (which generally marks the lateral extent of federal jurisdiction). CSX and/or its contractors are also operating heavy machinery in the riverbed including excavators and dump trucks. The photograph below shows a new railroad bed CSX has created out of material taken from the Nolichucky River riverbed and floodplain:



98. Upon information and belief, CSX is operating its equipment and excavating material on and in Forest Service-managed lands and waters outside of CSX's right-of-way as demonstrated in the photograph below:



99.     Excavating material from the Nolichucky River riverbed and national forest system lands threatens irreparable damage to the Nolichucky River Gorge.

100.    Members of plaintiff organizations who value the Gorge for its scenery, exceptional biodiversity, and business and recreational opportunities have repeatedly asked CSX to use alternative methods to reconstruct its railroad track that would not involve mining the riverbed and affecting the navigability of the river. CSX has refused those requests.

101.    CSX's ongoing work in the Nolichucky Gorge may adversely affect *Virginia spiraea* and Appalachian elktoe and its critical habitat.

102.    Excavation of banks in the Nolichucky Gorge will degrade habitat and directly impact individuals of *Virginia spiraea*.

103.    Excavation in the riverbed will degrade the habitat conditions that Appalachian elktoe need to persist and recover, including stable substrates, and will crush, injure, or displace individuals where present.

104.    Excavation in the riverbed and banks will also harm other aquatic and terrestrial species that occur in the Gorge through crushing, displacement, and sedimentation, including other mussel species, fish, and the beloved Eastern Hellbender.

105.    CSX's ongoing work has caused harm to and continues to threaten to modify the course, location, condition, or capacity of the river channel through the Nolichucky Gorge, which may adversely affect recreational users and commercial whitewater outfitters whose businesses rely on navigating the river, as well as making the river, nearby infrastructure, and downstream communities less resilient to flooding.

106.    CSX's ongoing work is adversely affecting the low-water channel within the Nolichucky Gorge. The low-water channel is hemmed in by cobbles, making it navigable even during drought and low-flow conditions, including during the summer season which is vitally important to recreational paddlers and commercial outfitters who operate float trips on the river at low flows. Excavation of the cobble bars is spreading out the low-water channel and impairing navigability.

107.    CSX's ongoing work is also adversely affecting the high-water channel within the Nolichucky Gorge, increasing the future risk of flooding. The new fill has a low angle of repose

(i.e., is gently sloped) and is constricting the river channel, which will increase flood velocity. At the same time, by removing cobble bars and other sediments, CSX is reducing the "rugosity" or roughness of the riverbed, which also increases flood velocity. Relatedly, because CSX is using rounded river rocks that do not "lock together" as fill material from an upland site would, the track itself is less resilient to future flooding. In fact, portions of CSX's reconstructed railroad bed have already collapsed. Accordingly, CSX's ongoing work poses a threat to downstream communities and others who rely on infrastructure next to the river.

### Federal Agency Responses

108.    CSX's ongoing reconstruction efforts require approvals from the Army Corps of Engineers, Forest Service, and Fish and Wildlife Service, among others.

109.    The Nolichucky River and multiple of its tributaries—including Devil's Creek and Hollow Poplar Creek, among others—are Waters of the United States for purposes of Section 404 of the Clean Water Act.

110.    The Nolichucky River is a navigable river for purposes of Section 10 of the Rivers and Harbors Act in part because commercial whitewater trips floating through the Gorge start in North Carolina and end in Tennessee. On these trips, commercial craft navigate the river in interstate commerce.

111.    CSX's ongoing activities in the Nolichucky River Gorge require permits from the Army Corps under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act.

112.    CSX began initial coordination with the Army Corps regarding work in the Nolichucky Gorge on October 10. *See* Email from Scott Glover, Clinchfield Consulting Group, to U.S. Army Corps (Oct. 10, 2024). In that email, CSX explained that a "track rebuild" was

already underway that "will involve complete roadbed reconstruction, culvert replacements, and reinstallation of track." *Id.*

113. On October 15, the Nashville District of the Army Corps authorized CSX to continue its ongoing work in the Gorge without Section 404 or Section 10 permits. Email from Casey Elhorn, Army Corps, to Scott Glover, Clinchfield Consulting Group (Oct. 15, 2024). The Nashville District informed CSX that is "anticipate[d]" that CSX's work would be exempt from Section 404 permitting requirements but that a Section 10 permit would be required. Upon information and belief, the Nashville District plans to issue an "after the fact" Section 10 permit once CSX's work is complete.

114. The Army Corps authorized CSX to work in the Gorge without requiring CSX to explain the scope of its planned work or showing how it satisfied any permitting exemptions. As late as November 4, the Army Corps was asking CSX to explain the haul "road" it had constructed across the river and whether CSX was "scraping the banks" presumably as dredge and fill. *See* Email from Casey Elhorn, Army Corps, to Scott Glover, Clinchfield Consulting (Nov. 4, 2024).

115. On November 1, the Wilmington District of the Army Corps told CSX that "exempt[ions] under Section 404(f) of the Clean Water Act are . . . the same in both Tennessee and North Carolina." Email from Brooke Davis, Army Corps, to Scott Glover, Clinchfield Consulting (Nov. 1, 2024). The Wilmington District informed CSX that "bridge replacement projects or the like, if a causeway, instream diversion, etc. would need to be installed within the water, these types of activities would constitute new fill (even if it temporary) into waters of the U.S., and would require a permit" under Section 404—even though the Nashville District had previously informed CSX that it "anticipated" no Section 404 permit would be necessary. *Id.*

116.    On the same day, the Wilmington District informed CSX that the Nolichucky River is not a Section 10 river in North Carolina—even though the Nashville District explained to CSX that the Nolichucky is a Section 10 River in Tennessee—and that, therefore, no Section 10 permit would be necessary. As of that date, the Wilmington District provided an online list of "waterbodies for which determinations have been made" under Section 10 which disclosed that the Nolichucky River was navigable for purposes of Section 10 in North Carolina. *See generally* 33 C.F.R. § 329.16 (requiring that "lists of final determinations of navigability are to be maintained in each district office" and prohibiting deletions from the list). That document has since been taken offline.

117.    The Wilmington District authorized CSX's ongoing work in the Gorge to continue and gave CSX two options to satisfy Section 404: (1) CSX could submit a permit application that the Army Corps would process within 48 hours or (2) the Army Corps would issue a permit "once the work is complete." *Id*.

118.    Upon information and belief, CSX has not been issued a Section 404 permit for any ongoing work in the Nolichucky Gorge. Upon information and belief, the Nashville District continues to take the position that CSX's work is exempt from Section 404 permitting requirements under the "maintenance" exemption codified at 33 U.S.C. § 1344(f)(1)(B) and 33 C.F.R. § 323.4(a)(2). Upon information and belief, the Wilmington District takes the position that CSX's work is not exempt from Section 404 and plans to issue a permit "once the work is complete."

119.    CSX is continuing to work in the Gorge in reliance on approvals from the Army Corps. The Nashville District issued its approval on or before October 15. The Wilmington District issued its approval on or before November 1.

31

120.    The Forest Service manages the lands and waters of the Nolichucky River Gorge. The lands in Tennessee are part of the Cherokee National Forest; the lands in North Carolina are part of the Pisgah National Forest. The Forest Service manages these lands, in part, by issuing special-use permits for private activities that occupy national forest system lands and waters. For example, commercial whitewater outfitters must obtain special-use permits from the Forest Service to operate their businesses and conduct commercial whitewater rafting trips in the Gorge.

121.    CSX is engaged in activities directly impacting national forest lands and waters in both the Cherokee and Pisgah National Forests, both through excavation and deposition of rock and sediments.

122.    The Forest Service is aware of CSX's ongoing reconstruction activities in the Nolichucky Gorge.

123.    CSX has not applied for or obtained a special-use permit from the Forest Service for its activities associated with reconstruction of the rail line through the Gorge, which are occurring both within and outside its right-of-way.

124.    The Forest Service has not issued a written determination that CSX's activities will not adversely affect the river's Wild and Scenic River study status.

125.    The Forest Service has not made a determination that CSX's activities are consistent with the governing forest plans for the Pisgah and Cherokee National Forests.

126.    Upon information and belief, the Forest Service has authorized CSX to proceed with its ongoing reconstruction activities on national forest system lands through the Nolichucky Gorge. CSX is operating in reliance on that authorization.

127.    Neither the Forest Service nor the Army Corps have conducted an analysis of their authorizations under NEPA or made alternative arrangements with the Council on Environmental Quality for NEPA compliance due to emergency circumstances.

128.    The work CSX is currently completing in reliance on informal authorizations from the Army Corps and Forest Service may cause significant adverse effects to both *Virginia spiraea* and Appalachian elktoe, including to Appalachian elktoe's critical habitat in the Nolichucky Gorge.

129.    As a result, the Fish and Wildlife Service is implementing emergency Section 7 consultation procedures.

130.    On or before November 7, 2024, the Fish and Wildlife Service made a determination that its exercise of emergency Section 7 consultation procedures complies with the ESA. *See* Letter from Janet Mizzi, Fish and Wildlife Service, to Brooke Davis, Army Corps (Nov. 7, 2024). On that day, the Fish and Wildlife Service sent a letter to the Army Corps stating that, pursuant to these emergency consultation procedures, the Army Corps could "initiate formal consultation" after the "emergency nature of this response has passed." *See id*. According to this letter, after the Army Corps provides a "Biological Assessment for the after-the-fact permitted activities from your office," the Fish and Wildlife Service "will provide an after-the-fact biological opinion." *Id.*

131.    The Army Corps is relying on that determination to authorize CSX's activities in the Gorge that may harm listed species and/or their habitats. CSX is relying on the Fish and Wildlife Service's determination to proceed with activities in the Gorge that may cause "take" of listed species.

132. The Fish and Wildlife Service's November 7 letter recommended conservation measures "to minimize potential adverse impacts to Appalachian elktoe and its designated critical habitat," including "[a]voiding the use of instream materials for reconstruction." *Id*. The letter also explained that "[a]ny materials used in re-establishing the toe-slope and for fill or final grading of the railway bed should not be mined from the river." *Id*. The letter did not mention measures to protect *Virginia spiraea*.

133. Upon information and belief, the Army Corps has not required CSX to follow the conservation measures for Appalachian elktoe and CSX is not implementing the recommendations from the Fish and Wildlife Service's November 7 letter. The Fish and Wildlife Service was aware that CSX was not implementing needed conservation measures when it determined that after-the-fact consultation would comply with the ESA. Neither the Army Corps nor the Forest Service has initiated formal Section 7 consultation.

## CLAIMS FOR RELIEF

**Claim 1: The Army Corps' authorizations allowing ongoing work in the Nolichucky Gorge violate the Rivers and Harbors Act and APA**

134. Plaintiffs incorporate by reference all preceding paragraphs.

135. The Rivers and Harbors Act makes it unlawful "to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of . . . the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same." 33 U.S.C. § 403; 33 C.F.R. § 322.3(a).

136. The Nolichucky River is a navigable water for purposes of the Rivers and Harbors Act from at least Poplar, North Carolina, to Erwin, Tennessee.

137. CSX is engaging in activities that will "alter or modify the course, location, condition, or capacity of . . . the channel of" the Nolichucky River in the Gorge in North Carolina and Tennessee. 33 U.S.C. § 403; 33 C.F.R. § 322.3(a). Ongoing CSX work outside the Nolichucky's navigable waters may also affect the navigability of the river. Accordingly, the work requires a permit under Section 10 of the Rivers and Harbors Act.

138. There are no applicable exemptions to the Section 10 permit requirement for CSX's ongoing work. *See* 33 C.F.R. §§ 322.3 and 322.4.

139. CSX has not obtained a Section 10 permit from either the Nashville or Wilmington Districts of the Army Corps.

140. The Army Corps may in some limited "emergency situations" approve "special processing procedures" for permits. *See* 33 C.F.R. §§ 322.1 and 325.2(e)(4). But the use of emergency procedures does not waive the substantive requirements of the Rivers and Harbors Act.

141. The Army Corps has not undertaken the substantive review required under the Rivers and Harbors Act, whether through standard procedures or emergency procedures. For example, the Army Corps has not determined that the work, without mitigation requirements such as prohibiting removal of rock from the riverbed, is in the public interest. *See* 33 C.F.R. § 320.4 (requiring public interest review for Army Corps permits).

142. That review may well find that CSX's ongoing work cannot qualify for a Section 10 permit because it does not include mitigation measures to avoid losses to environmental resources to the extent practicable. *See* 33 C.F.R. § 320.4(r).

143.     The Nashville District has authorized CSX to proceed with its ongoing work without a Section 10 permit. The Nashville District has informed CSX it will issue such a permit "after the fact."

144.     The Wilmington District has authorized CSX to proceed with its ongoing work without a Section 10 permit. The Wilmington District previously held out to the public that the Nolichucky River was a Section 10 navigable river but now takes the position that a Section 10 permit is not necessary because the Army Corps has not yet completed a formal study to determine if the Nolichucky is a navigable river.

145.     The Nolichucky River is used in interstate commerce as it flows through the Gorge from Poplar, North Carolina, to Erwin, Tennessee.

146.     CSX is relying on the Army Corps' authorizations to proceed with its ongoing work.

147.     Those authorizations are final agency actions under the APA.

148.     Those authorizations are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the Rivers and Harbors Act and APA. 5 U.S.C. § 706(2); *see* 33 U.S.C. § 403; 33 C.F.R. § 322.3(a). Alternatively, the Army Corps' failure to issue a Section 10 permit constitutes "agency action unlawfully withheld or unreasonably delayed," in violation of the APA. 5 U.S.C. § 706(1); *see* 33 U.S.C. § 403; 33 C.F.R. § 322.3(a).

**Claim 2: The Army Corps' authorizations allowing ongoing work in the Nolichucky Gorge violate the Clean Water Act and APA.**

149.     Plaintiffs incorporate by reference paragraphs 1 to 133.

150.     The Clean Water Act prohibits the discharge of "dredged or fill material into the navigable waters" without a permit. 33 U.S.C. §§ 1311, 1344.

151.     The Nolichucky River and its tributaries are navigable waters for purposes for Section 404 of the Clean Water Act.

152.     CSX's ongoing work in the Nolichucky Gorge triggers the requirement to obtain a permit under Section 404.

153.     CSX has not obtained a Section 404 permit.

154.     The Army Corps may in some limited "emergency situations" approve "special processing procedures" for permits. *See* 33 C.F.R. § 325.2(e)(4). But the use of emergency procedures does not waive the substantive requirements of the Clean Water Act.

155.     The Army Corps has not undertaken the substantive review required under the Clean Water Act, either under standard procedures or emergency procedures. For example, the Army Corps has not applied the Section 404(b)(1) guidelines to determine that there is no "practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem." *See* 40 C.F.R. § 230.10(a).

156.     Application of substantive requirements under Section 404 may determine that CSX's ongoing work cannot qualify for a Section 404 permit because there are practicable alternatives that would cause less harm, such as using fill material from upland sites rather than excavating the riverbed.

157.     Nevertheless, the Army Corps has authorized CSX to move forward with activities that involved the discharge of dredged or fill material in navigable waters without a permit. The Nashville District has authorized CSX's work under the theory that it is exempt from Section 404 requirements. The Wilmington District has authorized CSX's work under the theory that it will issue a formal permit after the work is complete.

158.    CSX is relying on the Army Corps' authorizations to proceed with work in the Nolichucky Gorge requiring a Section 404 permit.

159.    The Army Corps' authorizations are final agency actions under the APA.

160.    Those authorizations are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the Clean Water Act and APA. 5 U.S.C. § 706(2); *see* 33 U.S.C. § 1344.

161.    CSX's ongoing work in the Nolichucky Gorge is not exempt from Section 404 permitting requirements. *See* 33 U.S.C. § 1344(f)(1)(B).

162.    That exemption is only available to structures that are "currently serviceable." 33 U.S.C. § 1344(f)(1)(B). And work under the exemption may not change the "character, scope, or size of the original fill design." 33 C.F.R. § 323.4(a)(2).

163.    The railroad through the Nolichucky Gorge is not "currently serviceable," has not been "serviceable" since at least September 27, 2024, and will not be serviceable for several months. Infrastructure is not "currently serviceable" if it is "degraded as to essentially require reconstruction." *See* 86 Fed. Reg. at 2,875. CSX is completely reconstructing its railroad tracks in many areas in the Gorge. *See*, *e.g.*, Email from Scott Glover, Clinchfield Consulting Group, to U.S. Army Corps (Oct. 10, 2024) (explaining that CSX is engaging in "complete roadbed reconstruction, culvert replacements, and reinstallation of track."). As a result, the exemption does not apply. It also does not apply because CSX's ongoing work changes the "character, scope, or size of the original fill design."

164.    Any determination from the Army Corps that the exemption does apply is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the Clean Water Act and APA. 5 U.S.C. § 706(2); *see* 33 U.S.C. § 1344.

**Claim 3: The Forest Service's authorizations of ongoing work on the Pisgah and Cherokee National Forests violate the Forest Service Organic Act and National Forest Management Act**

165.    Plaintiffs incorporate by reference paragraphs 1 to 133.

166.    The Forest Service Organic Act and implementing regulations require private parties to obtain a special-use permit from the Forest Service before using or occupying national forest system lands. 16 U.S.C. § 551; 36 C.F.R. § 251.50(a).

167.    CSX is currently using and occupying national forest system lands and waters, including lands and waters outside its existing right-of-way, without a special-use permit. Upon information and belief, CSX has not applied for a special-use permit.

168.    A private party may in some emergency situations temporarily use or occupy national forest lands without a special-use permit, but only to the extent "necessary for the protection of life and property in emergencies, if a special use authorization is applied for and obtained at the earliest opportunity." 36 C.F.R. § 251.50(b).

169.    The absence of rail connectivity through the Nolichucky Gorge is not threatening life or property.

170.    Upon information and belief, the Forest Service has informally authorized CSX to move forward with its ongoing reconstruction activities on national forest system lands in the absence of a special-use permit.

171.    CSX is relying on the Forest Service's authorization to proceed with the work.

172.    This authorization(s) is a final agency action under the APA.

173.    Because the Forest Service has not issued a special-use permit, it has not made a determination that CSX's ongoing work is consistent with the governing forest plans for the

Pisgah and Cherokee National Forests, respectively. *See* 16 U.S.C. § 1604(i) (requiring all activities on national forest system land to be consistent with governing forest plans).

174.    CSX's work as it is currently being executed is not eligible for a special-use permit because it is not consistent with the governing forest plans. For example, CSX's work is not consistent with the Cherokee National Forest plan requirement that special uses be compatible with the Wild and Scenic river values of the Nolichucky River. Cherokee National Forest Revised Land and Resource Management Plan at 85. Nor is the work consistent with the Pisgah National Forest plan requirement that "[t]he river and its channel are not modified except for riparian or habitat improvements." Nantahala-Pisgah National Forests Land Management Plan at 261. CSX's work is not a "riparian or habitat improvement."

175.    Forest Service authorizations allowing CSX's work to proceed on national forest system lands in the absence of a special-use permit are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the Forest Service Organic Act, National Forest Management Act, and the APA. 5 U.S.C. § 706(2); *see* 16 U.S.C. § 551; 36 C.F.R. § 251.50(a); 16 U.S.C. § 1604(i). Alternatively, the Forest Service's failure to issue a special-use permit constitutes "agency action unlawfully withheld or unreasonably delayed," in violation of the APA. 5 U.S.C. § 706(1); *see* 16 U.S.C. § 551; 36 C.F.R. § 251.50(a).

**Claim 4: The Army Corps' and Forest Service's approvals violate NEPA and the APA**

176.    Plaintiffs incorporate by reference paragraphs 1 to 133.

177.    The Army Corps' and Forest Service's authorizations of ongoing work in the Nolichucky Gorge are major federal actions that require compliance with NEPA. 42 U.S.C. § 4332.

178.    Those authorizations are also final agency actions under the APA.

179. The Army Corps' and Forest Service's authorizations have reasonably foreseeable effects on the environment.

180. These effects are significant, or, at the very least, uncertain. Therefore, the Army Corps and Forest Service should have prepared an EIS or EA to assess the environmental impacts of their authorizations. *Id*. § 4332(2)(C); 40 C.F.R. § 1501.5.

181. Upon information and belief, neither the Army Corps nor the Forest Service have consulted with the Council on Environmental Quality about alternative arrangements for complying with NEPA in light of any emergency circumstances in the Nolichucky Gorge. *See* 40 C.F.R. § 1506.11.

182. Because the Army Corps and Forest Service did not conduct a NEPA study of their authorizations of ongoing work in the Nolichucky Gorge, they violated the APA by acting "without observance of procedure required by law." 5 U.S.C. § 706(2)(D); *see* 42 U.S.C. § 4332; 40 C.F.R. §§ 1500–1508. Alternatively, the Army Corps' and Forest Service's continuing failures to conduct a NEPA study for their authorizations of ongoing work in the Nolichucky Gorge constitute "agency action unlawfully withheld or unreasonably delayed," in violation of the APA. 5 U.S.C. § 706(1); *see* 42 U.S.C. § 4332; 40 C.F.R. §§ 1500–1508.

**Claim 5: The Fish and Wildlife Service's determination regarding the Army Corps' authorizations violate the ESA and the APA**

183. Conservation Groups incorporate by reference paragraphs 1 to 133.

184. CSX's work in the Nolichucky Gorge as authorized by the Army Corps of Engineers may adversely affect Appalachian elktoe and *Virginia spiraea*, and may cause adverse modification or destruction of Appalachian elktoe critical habitat.

185. To comply with the ESA, the Fish and Wildlife Service is implementing emergency Section 7 consultation procedures.

186.   Those procedures allow "consultation [to] be conducted informally through alternative procedures" but the Fish and Wildlife Service must "determine[]" that the "alternative procedures" are "consistent with the requirements of sections 7(a)–(d) of the [ESA]." 50 C.F.R. § 402.05(a). And "[f]ormal consultation shall be initiated as soon as practicable after the emergency is under control." *Id*. § 402.05(b).

187.   The Fish and Wildlife Service has made a determination that its exercise of emergency consultation procedure is consistent with Sections 7(a)–(d) of the ESA.

188.   That determination is a final agency action for purposes of APA review.

189.   The Fish and Wildlife Service's determination is arbitrary, capricious, and not consistent with Section 7(a)–(d) of the ESA because:

    a.  The alternative procedures fail to ensure against jeopardy to Appalachian elktoe and *Virginia spirea* and fail to ensure against adverse modification or destruction of critical habitat for Appalachian elktoe. 16 U.S.C. § 1536(a)(2);

    b.  The alternative procedures cannot produce meaningful "reasonable and prudent alternatives" to avoid jeopardy or destruction or adverse modification of critical habitat if necessary; or "specif[y] those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact" that does not rise to the level of jeopardy or adverse modification of critical habitat. 16 U.S.C. § 1536(b);

    c.  The alternative procedures fail to use "the best scientific and commercial data available" during Section 7 consultation. *See* 16 U.S.C. § 1536(c); and

d. The alternative procedures fail to prevent "irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures" that would avoid jeopardy or adverse modification while Section 7 consultation is ongoing. *See* 16 U.S.C. § 1536(d).

190. The Army Corps is relying on the Fish and Wildlife Service's determination to authorize CSX's work in the Nolichucky Gorge that may harm protected species.

191. The Fish and Wildlife Service's determination is inconsistent with the ESA as described above. As a result, that decision is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the ESA and the APA. 5 U.S.C. § 706(2); *see* 16 U.S.C. § 1536(a)–(d); 50 C.F.R. § 402.05.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:

A. DECLARE that the Army Corps violated the Rivers and Harbors Act of 1899, Clean Water Act, National Environmental Policy Act and Administrative Procedure Act in the respects set forth above;

B. DECLARE that the Forest Service violated the Forest Service Organic Act, National Forest Management Act, National Environmental Policy Act and Administrative Procedure Act in the respects set forth above;

C. DECLARE that the Fish and Wildlife Service violated the Endangered Species Act and Administrative Procedure Act in the respects set forth above;

D. VACATE and set aside authorizations from the Army Corps and Forest Service,

and the determination from the Fish and Wildlife Service, allowing CSX to move forward with ongoing work in the Nolichucky River Gorge;

E.       ENJOIN further work in reliance on authorizations from the Army Corps and Forest Service and the determination from the Fish and Wildlife Service until those agencies comply with their statutory obligations as set forth above;

F.       AWARD Plaintiffs their reasonable costs, fees, and expenses, including attorney's fees, associated with this litigation; and

G.       GRANT Plaintiffs such further and additional relief as the Court may deem just and proper.

Respectfully submitted, this the 18th day of November, 2024.

/s/ J. Patrick Hunter
J. Patrick Hunter
N.C. Bar No. 44485
Sam Evans
N.C. Bar No. 44992
Clara Derby
N.C. Bar No. 62330 (*admission pending*)
SOUTHERN ENVIRONMENTAL LAW
CENTER
48 Patton Ave., Suite 304
Asheville, NC 28801-3321
Telephone: 828-258-2023
phunter@selcnc.org; sscheidt@selcnc.org;
cderby@selcnc.org

*Counsel for American Whitewater and American Rivers*