**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION**

| | | |
|---|---|---|
| AMERICAN WHITEWATER, and AMERICAN RIVERS | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Case No. 1:24-cv-00284 |
| THE UNITED STATES ARMY CORPS OF ENGINEERS, THE UNITED STATES FOREST SERVICE, and THE UNITED STATES FISH AND WILDLIFE SERVICE, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF COMBINED MOTION
FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION**

# INTRODUCTION

When natural disasters strike, there is an understandable need for swift recovery. That need must be balanced with a long-term interest in preserving natural resources, protecting the health and safety of our communities, and ensuring against future disasters. Our federal laws recognize this tension and provide for expedited permitting procedures without waiving core legal requirements. Compliance with these laws ensures recovery can be prompt without sacrificing bedrock legal protections.

CSX Transportation ("CSX") is disregarding this careful balance and, day by day, tearing apart more public lands and waters in the beloved Nolichucky River Gorge (or "the Gorge") to rebuild a railroad that washed away during Hurricane Helene. This work is causing tragic, irreparable harm to the Gorge and the interests of American Whitewater, American Rivers, and their members ("River Advocates"). The work is proceeding under unlawful approvals issued U.S. Army Corps of Engineers ("Corps"), U.S. Forest Service, and U.S. Fish and Wildlife Service ("FWS"). We ask this court to temporarily enjoin Defendants' approvals without prejudice to their ability to re-issue approvals with the mitigation requirements necessary to comply with law, which would protect the Gorge.

1

River Advocates support expeditious rebuilding of the railroad, but not in a way that destroys the recreation, scenery, and ecology of the Gorge, its importance to local business, or increases the risk of downstream flooding. River Advocates have repeatedly asked defendant agencies to put required protections in place. They have refused. River Advocates have also asked CSX to put protections in place. CSX says it will not do so unless forced—hence this motion.[1]

## FACTUAL BACKGROUND

The Nolichucky River meanders from Huntdale, North Carolina to Douglas Lake, Tennessee. About six miles upstream of the state line, the river flows into the Nolichucky Gorge. Land and waters in the Gorge are managed by the United States Forest Service, which describes the Gorge as "one of the deepest, most spectacular gorges in the eastern United States." Ex. 1. In 1975, Congress designated the Nolichucky River as a "study" river under the Wild and Scenic Rivers Act, P.L. 93-621 (Jan. 3 1975) (amending 16 U.S.C. § 1276), and in 1994, the Forest Service designated a 7.2-mile section of the Gorge suitable for inclusion in the Wild and Scenic River System. *See id*. The Forest Service is charged with protecting the river's Wild and Scenic values.

---

[1] I certify that no artificial intelligence was used in the preparation of this Memorandum except for artificial intelligence embedded in standard legal research resources. The statements and citations in this Memorandum have been checked for accuracy by an attorney or paralegal.

The Gorge is home to a thriving whitewater industry based in Tennessee and North Carolina. *See*, *e.g.*, Ex. 2 ¶¶ 4, 8-9. Commercial whitewater trips navigate the Gorge from Poplar, North Carolina, to Erwin, Tennessee. *See*, *e.g.*, Ex. 3 ¶ 3. The outdoor recreation industry in Unicoi County, Tennessee—anchored by rafting, fishing, and hiking in the Gorge—generates approximately $17 million annually. Ex. 2 ¶ 9.

The remote and wild nature of the Gorge is ideal habitat for numerous species including black bear, bald eagles, smallmouth bass, brook trout, and hellbender salamanders. The Gorge is also home to species protected under the Endangered Species Act including *Virginia spiraea*, a flowering plant, and Appalachian elktoe, a mussel. Ex. 4 at 20; Ex. 5 at 11. The Gorge is occupied critical habitat for Appalachian elktoe. Ex. 5 at 11; 67 Fed. Reg. 61,016, 61,028 (Sept. 27, 2002).

On September 27, 2024, the Gorge experienced catastrophic flooding in connection with Hurricane Helene. The flood destroyed a train track in the Gorge owned by CSX and washed away miles of railroad track, the land beneath the track, and a bridge used by the railroad. The track has been unable to accommodate rail traffic since at least September 27; cargo is currently being rerouted.

By October 10, CSX or its contractors had begun the process of "complete roadbed reconstruction, culvert replacements, and reinstallation of track." *See* Ex.

3

18. To do so, CSX is dredging and excavating material from the riverbed and riverbanks, Ex. 2 ¶¶ 14-22, Ex. 3 ¶¶ 11-13, Ex. 7 ¶¶ 19-20, 20-23; operating heavy machinery including dump trucks and excavators in the river and along its banks, Ex. 2. ¶¶ 17, 20, 28, Ex. 3 ¶¶ 11-13, Ex. 7 ¶¶ 13, 19-20, 22, 23, 27; building roads in and across the river, Ex. 2 ¶¶ 14-15, Ex. 3 ¶¶ 8, 15, Ex. 7 ¶¶ 14, 19, 22; excavating and operating equipment in endangered species habitat, Ex. 3 ¶¶ 5, 8, Ex. 7 ¶¶ 35, 41; jackhammering and chiseling bedrock including below the ordinary high water mark, Ex. 7 ¶¶ 19, 21, 27; and discharging fill material in the Nolichucky River and its tributaries, Ex. 2 ¶ 24, Ex. 3 ¶ 20, Ex. 7 ¶¶ 13-14, 40-41.

The methods CSX is using are harming the environment, wildlife, and scenery in the Gorge as well as affecting navigability of the river. Ex. 2 ¶¶ 14-27, Ex. 3 ¶¶ 7-20, Ex. 7 ¶¶ 34-44, 38-44, Ex. 8 ¶¶ 10-13, Ex. 9 ¶ 7. This work requires permits from the Corps and Forest Service, which in turn require consultation with FWS under Section 7 of the Endangered Species Act.

CSX began its work without first securing necessary authorizations from any of these agencies, and thus without any mitigation requirements. On October 15, the Nashville District of the Corps, which has jurisdiction over work in Tennessee, informed CSX that it "anticipate[d]" CSX's work would be exempt from permitting requirements under Clean Water Act Section 404 but would require a permit under Section 10 of the Rivers and Harbors Act of 1899 ("Rivers and

Harbors Act"). Ex. 10. At the time it made those determinations, it did not have a full understanding of CSX's reconstruction plans in the Gorge. *See* Ex. 11 (Corps asking CSX to explain its ongoing actions on Nov. 4). Nevertheless, the Nashville District told CSX "to be clear – you are good to continue" reconstruction activities without Section 404 or Section 10 permits and without any limitations on the scope of work or mitigation requirements. Ex. 10.

On November 1, the Wilmington District of the Corps, which has jurisdiction over work in North Carolina, informed CSX that, unlike the Nashville District, at least some of CSX's work would require a Section 404 permit. Ex. 12. The Wilmington District explained that a Section 10 permit would not be necessary in North Carolina because the Corps had not made a formal Rivers and Harbors Act finding regarding navigability in North Carolina. *See id.*; Ex. 13. At the time, the Corps' published list of navigable Section 10 rivers in North Carolina included the Nolichucky River. Ex. 14. When River Advocates pointed this out, the Corps decided to take the list offline. *See* Ex. 13. The Wilmington District has authorized CSX to continue its reconstruction activities in the absence of Section 404 or Section 10 permits. Ex. 12.

Much of the work described above is happening on the Cherokee National Forest in Tennessee and Pisgah National Forest in North Carolina. Ex. 2 ¶¶ 14-21; Ex. 3 ¶¶ 8-17; Ex. 7 ¶¶ 13, 25. The Forest Service has authorized this work to

continue even though CSX does not have the required "special use" permit for each Forest. 36 C.F.R. § 251.50(a). Such a permit would ensure consistency with governing Land and Resource Management Plans, which, in turn, would protect the Wild and Scenic values of the Nolichucky River. 36 C.F.R. § 251.54(g)(2)(ii)(B); Exs. 19, 20.

Because the work as authorized by Defendants will adversely affect the endangered Appalachian elktoe mussel, including its designated critical habitat, FWS and the Corps have initiated emergency Section 7 consultation procedures, and FWS has made a determination that its exercise of those procedures complies with the Endangered Species Act even though it currently allows for unmitigated harm to listed species and critical habitat. *See* Ex. 15.

Since at least October 31, River Advocates have repeatedly alerted Defendants to harms occurring in the Gorge, explained to Defendants that their approvals are unlawful, and asked Defendants to put protections in place to avoid irreparably damaging the Gorge. Ex. 7 ¶¶ 8-11, 26-33; Ex. 13. River Advocates have spent dozens of hours attempting to work with Defendants in order to avoid litigation. *Id*.; *see* Hunter Decl. Those efforts have produced no meaningful protections for the Gorge, in part, due to unwillingness by the Corps to inform CSX of the ordinary high-water mark in the river, below which the Corps has jurisdiction. Ex. 7 ¶¶ 28-33. Even after filing suit, River Advocates have worked to

avoid the need for preliminary, emergency relief. *See* Hunter Decl. That too has

failed and work continues in the Gorge full steam ahead.

## STANDARD OF REVIEW

A preliminary injunction "preserve[s] the relative positions of the parties

until a trial on the merits can be held." *United States v. South Carolina*, 720 F.3d

518, 524 (4th Cir. 2013) (citation and quotation omitted). "A plaintiff seeking a

preliminary injunction must establish [1] that he is likely to succeed on the merits,

[2] that he is likely to suffer irreparable harm in the absence of preliminary relief,

[3] that the balance of equities tips in his favor, and [4] that an injunction is in the

public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). The

standard for granting a temporary restraining order is the same. *See DOL v. Wolf*

*Run Mining Co.*, 452 F.3d 275, 281, n.1 (4th Cir. 2006).

A court reviewing an agency action under the Administrative Procedure Act

("APA") shall "hold unlawful and set aside agency action[s], findings, and

conclusions" that the court finds to be "arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with the law," "in excess of statutory jurisdiction,

authority, or limitations," or "without observance of procedure required by law." 5

U.S.C. § 706(2). Agency action must be set aside when the agency "entirely failed

to consider an important aspect of the problem, offered an explanation for its

decision that runs counter to the evidence before the agency," or where the

7

agency's action is not based on a "reasoned analysis." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983).

## ARGUMENT

Day by day, River Advocates are harmed by CSX's unlawful and unnecessarily destructive work in the Nolichucky Gorge. The work fails to comply with core environmental laws, and CSX and Defendants have refused to put protections in place to ensure the exceptional recreational, scenic, and ecological values of the Gorge, including harm to rare species and the navigability of the river itself, are not forever damaged. River Advocates therefore have standing and satisfy all four factors for a temporary restraining order and preliminary injunction.

### I.     River Advocates have standing.

An organization has standing by virtue of its individual members' standing so long as the organization "seeks to protect interests germane to [its] purpose" and individual members' participation is not required. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 155 (4th Cir. 2000) (en banc). Here, the interests River Advocates seek to protect are central to their missions, and the claims and remedies in this action do not require the participation of individual members. Ex. 7 ¶¶ 3, 58; Ex. 8 ¶¶ 2, 21-23.

Individual members have standing where they meet the familiar three-part test: (1) actual or imminent injury, (2) causation, and (3) redressability. *Sierra Club*

8

*v. U.S. Dep't of Interior*, 899 F.3d 260, 283 (4th Cir. 2018). "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (cleaned up).

River Advocates' members have suffered concrete injuries, including harms to their economic, recreational, aesthetic, and scientific interests. *See*, *e.g.*, Ex. 2 ¶ 33; Ex. 3 ¶¶ 23-26; Ex. 7 ¶¶ 6-7; Ex. 8 ¶¶ 8-14, 20; Ex. 9 ¶¶ 8-9; Ex. 23 ¶¶ 10-14. Those injuries are traceable to Defendants' unlawful authorizations of CSX's work. *See*, *e.g.*, Ex. 2 ¶ 32; Ex. 3 ¶ 23; Ex. 7 ¶¶ 55-56; Ex. 8 ¶ 19; Ex. 9 ¶ 7. The injuries would be redressed by a favorable ruling requiring Defendants to comply with their legal obligations, which would reduce harm to the Gorge. *See*, *e.g.*, Ex. 7 ¶¶ 56-57; Ex. 8 ¶¶ 20, 23; Ex. 9 ¶ 10.

## II. River advocates are likely to succeed on the merits of their claims.

River Advocates are likely to succeed on their claims that Defendants' approvals and determination violate the APA because they are arbitrary, capricious, and not in accordance with law. Although Defendants promise future, "after the fact" permitting processes, the authorizations Defendants have *already* made are unlawful, and CSX's actions in reliance on those authorizations is causing harm that cannot be undone by a future permit.

9

A. <u>Authorizations issued by the Corps and Forest Service and the determination made by the FWS are final agency actions under the APA.</u>

The authorizations issued by the Corps and Forest Service and determination made by the FWS are final agency actions reviewable under the APA. 5 U.S.C. § 704. "'Agency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id*. § 551(13). Relevant here, "license" includes any "form of permission," including an "approval" or "statutory exemption." *Id*. § 551(8).

Whether an agency action is final "is a pragmatic and flexible" inquiry, *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1279 (D.C. Cir. 2005) (cleaned up), that turns on two factors: First, "the action must mark the consummation of the agency's decisionmaking process," *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). "The mere possibility that an agency might reconsider . . . does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012). Second, "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (cleaned up). The challenged approvals and determination meet both factors.

The Corps, Forest Service, and FWS have all issued final approvals or determinations allowing CSX to move forward with reconstruction in the Gorge. Those agencies have consummated their decisionmaking processes and authorized

CSX to proceed with unmitigated work that is happening right now. *See* Exs. 10, 12, 15, 16.

Further, CSX is relying on those authorizations and determination to shield it from criminal and civil liability under the Rivers and Harbors Act (33 U.S.C. § 406), Clean Water Act (33 U.S.C. § 1319), Forest Service regulations (36 C.F.R. §§ 261.10, 261.1b), and Endangered Species Act ("ESA") (16 U.S.C. § 1540). CSX's present legal obligations (or lack thereof) flow directly from Defendants' authorizations and determination. River Advocates' legal rights to protect their interests through public notice and comment on permits and environmental analyses are also directly cut off by the same final actions.

B. The Corps' authorizations violate the APA because they are not in accordance with Section 10 of the Rivers and Harbors Act.

1. *The Nolichucky River is navigable for purposes of the Rivers and Harbors Act in North Carolina and Tennessee.*

The Rivers and Harbors Act applies to "navigable rivers" defined as "those waters of the United States that . . . are presently used, or have been used in the past, or may be susceptible to use to transport interstate or foreign commerce." 33 C.F.R. § 322.2(a); 33 U.S.C. § 403. The presence of recreational craft can indicate that a river is used for interstate commerce and is thus navigable under the Rivers and Harbors Act. 33 C.F.R. § 329.6(a). The Corps takes the position that the Nolichucky River is navigable for purposes of the Rivers and Harbors Act in

Tennessee but not in North Carolina, even though the Corps previously explained to the public that the river *was* navigable in North Carolina. *See* Ex. 13; Ex. 14. The Nolichucky River is used in interstate commerce on a daily basis as commercial whitewater rafting outfitters navigate the river with guests from Poplar, North Carolina, to Erwin, Tennessee. Ex. 2 ¶ 4, 14; Ex. 3. ¶¶ 3, 8; Ex. 9 ¶ 3; Ex. 22. As a result, the river is navigable for purposes of the Rivers and Harbors Act in both Tennessee and North Carolina. Any Corps' finding otherwise is arbitrary and capricious.

    2. *The Corps' authorization of CSX's activities is not in accordance with the Rivers and Harbors Act and therefore violates the APA.*

Because the Nolichucky River is navigable under the Rivers and Harbors Act, CSX must obtain a permit under Section 10 of that Act "prior to" engaging in activities that will affect navigability. 33 U.S.C. § 403; 33 C.F.R. § 322.3(a). CSX has not obtained a Section 10 permit, and its current activities are not eligible for a permit because they violate substantive Section 10 permitting requirements including, but not limited to, ensuring that the permitted work is in the public interest, 33 C.F.R. § 320.4(a), and that it includes required mitigation measures, *id*. § 320.4(r). Nevertheless, the Corps has authorized CSX's unmitigated work to move forward. Those authorizations violate the APA because they are arbitrary, capricious, an abuse of discretion, and not in accordance with the Rivers and Harbors Act. 5 U.S.C. § 706(2); *see* 33 U.S.C. § 403; 33 C.F.R. § 322.3(a).

To be sure, the Corps may be able to exercise emergency permitting procedures, but those procedures do not—and cannot—waive substantive requirements of the Rivers and Harbors Act (nor the Clean Water Act discussed below). *See* 33 C.F.R. §§ 322.1, 325.2(e)(4). Congress has not given the Corps that authority. While the Corps may be able to issue after-the-fact permits in some situations, such permits could only be for lawful work. The Corps' existing authorizations do not impose required conditions on the work that would be necessary to make it eligible for a Section 10 permit (or Section 404, discussed below) no matter when it is issued. In other words, the Corps' current authorizations are foreclosing compliance with Section 10.

C. The Corps' authorizations violate the APA because they are not in accordance with Section 404 of the Clean Water Act.

The Clean Water Act prohibits the discharge of "dredged or fill material into the navigable waters" without a permit. 33 U.S.C. §§ 1311, 1344. There is no dispute that CSX's ongoing activities in the Gorge constitute such discharges. *See e.g.*, Exs. 12, 17. Nevertheless, the Nashville District has authorized Section 404-triggering activities to proceed under the theory that CSX's work is exempt from Section 404 permits. Ex. 10. The Wilmington District has authorized Section 404-triggering activities to proceed under the theory that it will issue a legally compliant Section 404 permit "after the fact." Ex. 12. Neither approach is lawful.

13

The "exemption" cited by the Nashville District applies to "maintenance, including emergency reconstruction of recently damaged parts, of currently serviceable structures." 33 U.S.C. § 1344(f)(1)(B). "Maintenance does not include any modification that changes the character, scope, or size of the original fill design." 33 C.F.R. § 323.4(a)(2). For "structures" to be "currently serviceable" they must not be so "degraded as to essentially require reconstruction." *See* 86 Fed. Reg. 2,744, 2,875 (Jan. 13, 2021); *see Swinomish Indian Tribal Cmty. v. Skagit Cnty. Dike Dist. No. 22*, 618 F. Supp. 2d 1262, 1268 (W.D. Wash. 2008) ("Under the plain meaning of the phrase, 'currently serviceable' must mean that a structure is performing its function to some degree.").

CSX's activities in the Gorge do not apply for this exemption for two reasons. First, its railroad is not "currently serviceable"—it will take weeks or months before any function is restored to its rail line. CSX has also explained that it is engaging in "complete roadbed reconstruction," Ex. 18, but activities that "essentially require reconstruction" are not exempt, *see* 86 Fed. Reg. at 2,875. The Court cannot defer to an interpretation that would stretch the statutory term "currently serviceable" to mean "totally unusable." *See Loper Bright v. Raimondo*, 144 S.Ct. 2244, 2266 (2024) ("In the business of statutory interpretation, if it is not the best, it is not permissible."). Second, CSX's activities are changing the

"character, scope, or size of the original fill design" making the exemption unavailable. 33 C.F.R. § 323.4(a)(2); *see* Ex. 3 ¶ 21; Ex. 23 ¶ 7.

The Wilmington District recognizes that at least some of CSX's work is subject to Section 404's substantive requirements but plans to issue a permit after-the-fact. Ex. 12. Problematically, the current work does not meet Section 404's requirements making the work ineligible for a permit—now or later—which makes the Corps' current authorization unlawful. For example, there are "practicable alternative[s] to the proposed discharge which would have less adverse impact on the aquatic ecosystem" such as using fill from upland sites rather than excavating the riverbed or using retaining structures in some areas to limit the amount of fill material needed. 40 C.F.R. § 230.10(a); *see* Ex. 7 ¶¶ 18, 44. Because CSX's current activities do not qualify for a Section 404 permit—whether issued now or later—the Corps cannot cure its unlawful approvals by issuing one later.

Because the Corps' authorizations of CSX's activities are "not in accordance with" the Clean Water Act, they violate the APA. 5 U.S.C. § 706(2); *see* 33 U.S.C. § 1344. They are also inconsistent with each other and arbitrary and capricious.

D.  The Forest Service's authorizations violate the APA because they are not in accordance with the agency's Organic Act or the National Forest Management Act.

CSX is currently conducting reconstruction activities outside its right-of-way on land and waters under the jurisdiction of the Pisgah and Cherokee National

Forests. The occupancy of those national forest system lands and waters is unlawful without a special use permit issued by the Forest Service. 16 U.S.C. § 551; 36 C.F.R. § 251.50(a); *see*, *e.g.*, Ex. 9 ¶ 3 (noting that a special use permit is required to operate in the Gorge).

CSX has not obtained a special use permit and, indeed, its current activities are not eligible for one. For example, a special use permit may only be issued if it "[m]inimize(s) damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect[s] the environment." 36 C.F.R. § 251.56(a)(1). The Forest Service has not required minimization, nor is CSX minimizing impacts voluntarily. Special use permits may only be issued only if consistent with governing management plans—or "forest plans." 36 C.F.R. § 251.54(g)(3)(ii)(B); 16 U.S.C. § 1604(i). But CSX's actions violate several requirements under the forest plans for the Pisgah and Cherokee National Forests, including, for example, a prohibition of any river or river channel modifications "except for riparian or habitat improvements," which CSX's work is emphatically not. *See* ECF No. 1 at ¶ 174; Exs. 19, 20.

Nevertheless, in the absence of a required special use permit, the Forest Service has authorized CSX's activities to continue. That authorization violates the APA because it is arbitrary, capricious, and was issued "not in accordance with law" including the Forest Service Organic Act and National Forest Management

Act. 5 U.S.C. § 706(2); *see* 16 U.S.C. § 551; 36 C.F.R. § 251.50(a); 16 U.S.C. § 1604(i). To the extent the Forest Service is allowing a temporary, emergency occupancy of national forest lands and waters, that, too, is unlawful under the same authorities because reconstruction without a permit is not "necessary for the protection of life and property." *See* 36 C.F.R. § 251.50(b).

E. The Corps' and Forest Service's approvals violate the APA because they were issued without observance of procedure required by the National Environmental Policy Act.

Because the Corps' and Forest Service's approvals are final agency actions under the APA and "major federal actions significantly affecting the quality of the human environment," they require review under the National Environmental Policy Act ("NEPA"). 42 U.S.C. § 4332(2)(C). NEPA's objectives are "realized through a set of action-forcing procedures that require that agencies take a hard look at environmental consequences, . . . and [] provide for broad dissemination of relevant environmental information." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citation and quotations omitted). Here, this is accomplished through preparation of an Environmental Impact Statement or Environmental Assessment. 40 C.F.R. §§ 1501.3(c)(3), 1501.5(a). The Corps and the Forest Service have made no attempt to comply with NEPA.

To be sure, NEPA's ordinary process may yield in an emergency, but not unless the agency "consult[s] with the Council [on Environmental Quality] about

alternative arrangements for compliance." 40 C.F.R. § 1506.11. The Corps and the Forest Service have not consulted with the Council on Environmental Quality about alternative arrangements for complying with NEPA.

Because the Corps and Forest Service approvals were issued "without observance of procedure required by [NEPA]," they violate the APA. 5 U.S.C. § 706(2)(D).

F.   Alternatively, the Corps' failure to issue a Section 10 permit, the Forest Service's failure to issue a special use permit, and both agencies' failures to comply with NEPA can be compelled under the APA.

The APA also provides relief for "failure to act," 5 U.S.C. §§ 551(13), 706(1), when "a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take," *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis omitted). Here, there are three discrete, required actions at issue: 1) Corps issuance of a Section 10 permit, 2) Forest Service issuance of a special use permit, and 3) compliance with NEPA.

The Corps and Forest Service cannot authorize activities that require Section 10 and special use permits, respectively, in the absence of those permits. 33 U.S.C. § 403; 36 C.F.R. § 251.50(a). The Court should compel the agencies to undertake these permitting processes, through which protective requirements would be imposed. *See* 5 U.S.C. § 706(1). Of course, we recognize this is an unusual situation in which the agencies are contemplating after-the-fact permits. However,

by allowing work now that *cannot* meet substantive permitting requirements later, the Corps and Forest Service are implicitly waiving permitting requirements that they have no power to waive. In other words, by not imposing protective conditions now, the agencies are foreclosing the possibility of complying with the law in a future after-the-fact permit. Accordingly, compelling the agencies to issue lawful permits at *any* time necessarily requires compelling them to impose necessary protective conditions *now*.

The Corps' and Forest Service's approvals also require compliance with NEPA—specifically the requirement to prepare an Environmental Impact Statement, Environmental Assessment, or make alternative arrangements with the Council on Environmental Quality. *See supra* Section II(E); *Aberdeen & Rockfish R.R. Co. v. Students Challenging Regul. Agency Procs. (S.C.R.A.P.),* 422 U.S. 289, 319 (1975) (recognizing that NEPA creates a "discrete procedural obligation" that agencies must undertake "in connection with certain major federal actions"). Neither the Corps nor Forest Service have made any effort to comply with NEPA, and the Court should compel compliance as "unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

G. The Fish and Wildlife Service violated the APA by issuing a Section 7 determination that violates the ESA.

FWS and the Corps have initiated emergency consultation under the ESA, through which FWS plans to issue an "after the fact" biological opinion. *See* Ex.

15. To use emergency procedures, FWS must "determine[]" that its substitute procedures are "consistent with the requirements of sections 7(a)–(d) of the [ESA]." 50 C.F.R. § 402.05(a). FWS made that determination on or before November 7. Ex. 15. FWS's determination is a final agency action, *see supra* Section II(A), that violates the APA because it is arbitrary, capricious, and "not in accordance with" the ESA. 5 U.S.C. § 706(2).

ESA Section 7(a)(2) commands each federal agency to ensure that its actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2). "Destruction or adverse modification" "means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." 50 C.F.R. § 402.02.

FWS could not rationally find that its emergency procedures were consistent with Section 7(a), because CSX's actions, as authorized by the Corps and Forest Service, are appreciably diminishing the value of critical habitat for Appalachian elktoe and likely causing harm to individual mussels. FWS recognizes the Gorge as occupied critical habitat for elktoe. *See* Ex. 5 at 11; 67 Fed. Reg. at 61,028. Protecting this habitat is necessary to the recovery of the species. *See* Ex. 21 at iii. CSX actions as authorized by the Corps are ruining this habitat, possibly harming

individual mussels, and likely rendering this river—key to recovery of the species—wholly uninhabitable for Appalachian elktoe. *See* Ex. 2 ¶ ¶ 17, 19, 29; Ex. 3 ¶ ¶ 8, 10-13; Ex. 7 ¶ 41. The work is also impacting habitat for *Virginia spiraea*, and possibly destroying individual plants. *See* Ex. 3 ¶¶ 9, 13, 15, 20; Ex 4.

FWS's emergency consultation "determination" also violates Section 7(b) of the ESA, which requires FWS to identify "reasonable and prudent alternatives" to avoid jeopardy or destruction or adverse modification of critical habitat if necessary; or alternatively, to specify "reasonable and prudent measures" needed to minimize harm to elktoe and *Virginia spiraea*. 16 U.S.C. § 1536(b). FWS knows that specific mitigation measures, at the very least, are necessary to meet the requirements of the ESA. *See* Ex. 15. FWS also knew, when it issued its Nov. 7 letter, that CSX was not applying those mitigation measures and was not being required by the Corps to do so. As a result, FWS could not rationally determine that an after-the-fact biological opinion and consultation would meet the requirements of the ESA. The determination was therefore arbitrary and capricious.

Third, FWS's determination is inconsistent with Section 7(d) of the ESA, which prohibits "irreversible or irretrievable commitment of resources" that could "foreclos[e] the formulation or implementation of any reasonable and prudent alternative measures." 16 U.S.C. § 1536(d). FWS knows that the ongoing work, as authorized by the Corps, is foreclosing the implementation of the conservation

measures that FWS believes are necessary, such as "[a]voiding the use of instream materials for reconstruction." Ex. 15 at 3. Under these circumstances, FWS's determination that an after-the-fact permit and biological opinion would satisfy Section 7(d) was arbitrary and capricious.

### III. Rivers Advocates will continue suffering irreparable harm if an injunction is not granted.

For purposes of a preliminary injunction, harm is irreparable when it "[cannot] be remedied by money damages at the time of judgment." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987). "Irreparable harm should be determined by reference to the purposes of the statute being enforced." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 818 (9th Cir. 2018). The threshold for establishing irreparable harm in cases involving the ESA is particularly low. *See Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015), *cert. denied*, 137 S. Ct. 293 (2016) (finding that in ESA cases "establishing irreparable injury should not be an onerous task for the plaintiffs."). A plaintiff's aesthetic and recreational interests are harmed by actions that impair his or her ability to enjoy wildlife in its natural environment. *See, e.g., Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 52 (D.C. Cir. 1988).

Economic losses can also constitute irreparable harm when there is no adequate remedy available at the conclusion of litigation, such as when the existence of the movant's business is threatened. *Mountain Valley Pipeline, LLC v. Western Pocahontas Properties L.P.*, 918 F.3d 353, 366 (4th Cir. 2019).

CSX's ongoing work as authorized by defendant agencies is currently and will continue to cause River Advocates' irreparable harm absent an injunction.

CSX is changing the navigability of the Nolichucky River including by blasting bedrock, mining river materials, and widening the river corridor. *See, e.g.*, Ex. 7 ¶¶ 12-25. These changes are imposing irreparable harm on the recreational and aesthetic values of the river that enable it to support a commercial rafting industry, and they therefore pose irreparable risks to River Advocates' members' businesses that cannot be remedied by money damages. Ex. 9 ¶¶ 7-9; Ex. 3 ¶¶ 25-26; Ex. 2 ¶¶ 25-26; Ex. 23 ¶¶ 10-14.

CSX's actions are irreparably harming environmental conditions in the Gorge and threatening its Wild and Scenic River values. *See, e.g.*, Ex. 7 ¶¶ 51-53. CSX's actions pose particularly acute threat to species listed under the ESA and their critical habitat which in turn harm River Advocates' members ability to look for and study these species. *See, e.g.*, Ex. 8 ¶¶ 8-9. And CSX's actions are irreparably harming national forest system lands and waters, which impairs the interest of River Advocates members' business, aesthetic, and recreational interests

in those same resources. *See, e.g.*, Ex. 9 ¶¶ 7-9. Had Defendants implemented their approvals consistent with their statutory obligations, many of these harms would be mitigated, if not entirely avoided.

## IV. The Balance of Harms and the Public Interest Justify Granting Injunctive Relief

The third and fourth preliminary injunction factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

There are serious, on-the-ground consequences from Defendants' unlawful approvals of CSX's destructive, irreparable activities in the Nolichucky Gorge. River Advocates and the public have a strong, well-recognized interest "in preserving nature," ensuring "[environmental law] be carried out accurately and completely," and "avoiding irreparable environmental injury." *S. Appalachian Mountain Stewards v. A&G Coal Corp.*, No. 2:12CV00009, 2013 WL 5149792, at *3 (W.D. Va. Sept. 13, 2013) (noting, in the context of a stay motion, "the well-established public interest in preserving nature and avoiding irreparable environmental injury"); *see also North Carolina v. City of Va. Beach*, 951 F. 2d 596, 603 (4th Cir. 1991) (noting the Fourth Circuit has "favored injunctions when a NEPA review is required and has not been conducted"). For ESA claims, "[t]he equitable scales are always tipped in favor of the . . . species." *Red Wolf Coal. v. U.S. Fish & Wildlife Serv.*, 210 F. Supp. 3d 796, 806 (E.D.N.C. 2016) (citation omitted). River Advocates also have a strong interest in ensuring the Nolichucky

River remains safely and reliably navigable by individual recreators and commercial outfitters. *See e.g.*, Ex. 2 ¶¶ 25-27.

Importantly, River Advocates do not seek to prevent the expedited rebuild of the CSX line, only that it be done lawfully, which includes taking all practicable measures to minimize impact to the environment, navigability, and river safety.

Notably, CSX is currently rerouting its cargo around the Gorge and will continue doing so for months or weeks. Any temporary monetary harms to CSX—a Fortune 500 company—pale in comparison to the irreparable harms being in inflicted on River Advocates and their members. *See Ohio Valley Env't Coal. v. U.S. Army Corps of Eng'r*, 528 F. Supp. 2d 625, 632 (S.D.W.V. 2007) (finding "temporary economic harm can be outweighed by the permanent harm to the environment that comes from the filling of streams and valleys.").

## <u>CONCLUSION</u>

For the reasons set forth above, River Advocates respectfully request the Court enter a temporary restraining order and preliminary injunction.

<u>/s/ J. Patrick Hunter</u>
J. Patrick Hunter
N.C. Bar No. 44485
Sam Evans
N.C. Bar No. 44992
Clara J. Derby
N.C. Bar No. 62330
SOUTHERN ENVIRONMENTAL LAW
CENTER

48 Patton Ave., Suite 304
Asheville, NC 28801-3321
Telephone: 828-258-2023
phunter@selcnc.org; sevans@selcnc.org;
cderby@selcnc.org

*Counsel for American Whitewater and American Rivers*