IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | |
|---|---|
| AMERICAN WHITEWATER, and AMERICAN RIVERS<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES ARMY CORPS OF ENGINEERS, THE UNITED STATES FOREST SERVICE, and THE UNITED STATES FISH AND WILDLIFE SERVICE,<br><br>Defendants. | Case No. 1:24-CV-00284 |

## CSX TRANSPORTATION, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

## PRELIMINARY STATEMENT

Hurricane Helene devastated western North Carolina and eastern Tennessee in late September 2024. Part of this devastation included destruction of approximately 60 miles of rail lines that broke a critical north-south connection in this Nation's railway network. Working cooperatively and in consultation with multiple federal agencies, Proposed Intervenor CSX Transportation ("CSXT") has for many weeks worked to rebuild the destroyed rail lines (the "Rebuild"). The Rebuild, in cooperation with and under the supervision of governmental entities, continues as the federal agencies consult and work with CSXT to restore this critical piece of National infrastructure.

Now, despite significant governmental consultation and performance of critical work for weeks, Plaintiffs ask this Court to order that CSXT halt the Rebuild through a Motion for Temporary Restraining Order and Preliminary Injunction demanding that this Court grant the requested relief within forty-two hours. But Plaintiffs face an extremely high burden that requires a "clear" showing of entitlement to the extraordinary relief that they seek. They cannot meet their burden.

*First*, Plaintiffs' demand swift action from this Court, but they have sat on their rights for weeks. Plaintiffs have known about the work being performed, yet they did not take immediate action to challenge the Rebuild. Courts have appropriately denied temporary restraining orders in this very situation, rightly determining that any decision on the merits needed to occur after appropriate—not rushed—briefing.

*Second***,** Plaintiffs' attempt to halt the Rebuild and hinder restoration of this critical infrastructure is likely to fail on the merits. The Federal Government has long sought to enforce uniform regulation of railroads throughout the Nation. Congress has enacted sweeping legislation

1

to that effect that preempts attempts like those advanced by Plaintiffs who seek to regulate construction and maintenance of railroad lines. Plaintiffs are unlikely to succeed on the merits because Congress has vested exclusive jurisdiction in these matters elsewhere.

**Third,** Plaintiffs suffer no irreparable harm. Plaintiffs claim that they suffer irreparable harm through the loss of ability to enjoy the natural environment. But there is no harm—federal agencies, and particularly the U.S. Army Corps of Engineers, are actively consulting with CSXT regarding work to rebuild the railroad while protecting the environment.

**Fourth,** the balance of equities and public interest favor CSXT. The re-routing of trains hundreds of miles around the current bottleneck of this critical rail line is estimated to cost tens of millions of dollars, causing significant financial harm. Freezing the Rebuild would magnify these costs, as each day that passes represents further economic harm. But the harm is not economic alone. CSXT employees have been furloughed or transferred long distances from home as a result of the shut down of this critical rail line. Moreover, CSXT holds a special relationship with the public as a Class I railroad, providing an important public service in transporting critical goods that supply the Nation's consumers, energy producers, and other industries. As such, the public's significant interest in rebuilding the Nation's infrastructure back to full capacity drastically outweighs Plaintiffs' alleged interests.

Plaintiffs' Motion for Temporary Restraining Order should be denied.[1]

---

[1] In filing this opposition to Plaintiffs' Motion for Temporary Restraining Order, CSXT does not waive its right to oppose Plaintiffs' request for preliminary injunction and will respond to that request under the deadlines set in this Court's Local Rules or as directed by the Court. Further, CSXT does not waive, and expressly reserves, all applicable defenses and arguments under Federal Rule of Civil Procedure 12, related to *forum non conveniens*, and any other argument under initial motion practice. CSXT files this Opposition based on its current knowledge and the expedited timeline under which Plaintiffs seek extremely expedited relief.

I. BACKGROUND

A. CSXT Rail Network

CSXT is a Class I railroad. Its network (CSXT's "Rail Network") encompasses about 20,000 route miles of track in 26 states, the District of Columbia and the Canadian provinces of Ontario and Quebec. Its transportation network serves some of the largest population centers in the nation. Nearly two-thirds of Americans live within CSXT's service territory. As such, it plays a critical role in interstate commerce, including, among other things, the shipment of materials and supplies throughout the Eastern United States. (Declaration of Ed Sparks ¶ 4 & Fig. 1 ("Sparks Decl.").)[2]



As a Class I railroad, CSXT is a "rail carrier" as defined by federal law, 49 U.S.C. § 10102(5). CSXT's Rail Network is highly interrelated. As such, even minor disruptions or delays in one location on the CSXT Rail Network can have a ripple effect on the efficiency of CSXT rail operations across hundreds of miles in each direction from a single chokepoint. (*Id.* ¶¶ 17-18.)

---

[2] The Sparks Declaration is located at docket entry 12-1.

CSXT's Rail Network includes the Blue Ridge Subdivision, which connects North Carolina and Tennessee through the Nolichucky River Gorge. This railroad line is critical to CSXT's Rail Network because it is one of only four major routes CSXT utilizes to move freight north to south throughout its Rail Network. (*Id*. ¶¶ 5-6.) Approximately eight CSXT trains pass through the Nolichucky River Gorge each day. (*Id*. ¶ 7.)

**B. Hurricane Helene**

On September 27, 2024, the Nolichucky River experienced catastrophic flooding caused by heavy rainfall associated with Hurricane Helene. (*Id*. ¶ 9.) The flooding caused severe damage to CSXT's rail line located along the Nolichucky River, including the displacement of large sections of CSXT's railroad track, washing away rail beds and land beneath the track, and destroying at least two railroad crossing bridges used by CSXT. (*Id*. ¶ 10.) Of the 115 miles of the Blue Ridge Subdivision portion of the Rail Network, approximately 60 miles were impacted



by the destruction. CSXT has not been able to utilize this portion of the Blue Ridge Subdivision since Hurricane Helene. (*Id*. & Fig. 2.)

Accordingly, CSXT must divert shipments around the Blue Ridge Subdivision. (*Id*. ¶¶ 16-17.)

Rerouting CSXT's trains is not a trivial inconvenience, as Plaintiffs suggest. (ECF No. 5-2, at 25.)

4

The reroute adds on average 400 miles and up to 550 miles to each shipment route. (Sparks Decl. ¶ 17.) In the below map, the green lines represent where trains are being rerouted from the red lines due to this sixty-mile outage on the Blue Ridge Subdivision. (Fig. 3.)



The annualized impact of rerouting around the Blue Ridge Subdivision will increase the length of shipping routes by tens of millions of miles. (Sparks Decl. ¶ 17.)

The rerouting of trains also requires significant additional costs in terms of additional miles, crew, fuel, and rail car handlings. (*Id*. ¶ 20.) The estimated additional cost of rerouting trains around the Blue Ridge Subdivision is in the tens of millions of dollars. (*Id*.)

Additionally, over thirty CSXT employees who previously worked on the Blue Ridge Subdivision railroad line are on furlough or have had to take transfer status. (*Id*. ¶ 19.)

C. **The Rebuild**

The temporary closure of the Blue Ridge Subdivision makes what was already difficult recovery even more challenging for communities in the Southeast that have been devastated by

the Hurricane. Rebuilding the railroad will ensure that these communities can efficiently and promptly get the vital energy resources, building materials, and consumer goods they need to get back on their feet. In order to begin using this rail line again, CSXT must reconstruct and repair the destroyed and damaged rail beds, tracks and associated bridges and crossings that were damaged by the flooding. (*Id*. ¶¶ 13, 16.)

CSXT embarked on the Rebuild over a month ago working with a highly skilled team of engineers and environmental specialists to support recovery and restoration efforts within the regulatory framework. (*Id*. ¶¶ 12-14.) CSXT has made significant progress on the reconstruction, but months of work remain and time is of the essence. (*Id*. ¶ 14.) The total cost of the reconstruction is expected to exceed $200 million. (*Id*. ¶ 15.) Until reconstruction of the railroad line is complete, rerouting around the Blue Ridge Subdivision has and will continue to result in shipment delays for customers, negative effects on the regional economy during a time of recovery, and significant costs and operational disruptions for CSXT. (*Id*. ¶¶ 16-20.)

CSXT is accomplishing the Rebuild collaboratively with numerous governmental agencies including the U.S. Army Corps of Engineers, USDA Forestry Service, and U.S. Fish and Wildlife. (*Id.* ¶ 11.) These agencies are kept closely abreast of CSXT's Rebuild on an emergency and changing basis. And CSXT continues to abide by their directives and has been in nearly-constant contact with those agencies. (*See id.* ¶ 12.)

On the Tennessee side, the Corps' Nashville District is currently involved in the Rebuild. CSXT is required to conduct as much work as practicable in dry areas and minimize equipment work below the ordinary high water mark ("OHWM") of the Nolichucky River. (*See* November 20, 2024 Letter from Nashville District at 3, attached as Exhibit 1.) CSXT may not remove certain in-stream materials. (*Id.*) CSXT is currently prohibited from dredging from below the OHWM of

6

the Nolichucky River or any other waters of the United States to re-establish toe slope and for fill for grading. (*Id.*) CSXT must conduct debris removal from existing rights-of-way and access points as much as practicable. (*Id.*) For portions of the east riverbank of the Nolichucky River that have already been disturbed in the course of CSXT's Rebuild, CSXT must stabilize and reconstruct the riverbank in consultation with the Government's hydrological experts. (*Id.* at 4.) CSXT must take significant steps to minimize potential impacts to the Appalachian elktoe and Virginia spiraea. (*Id.* at 4-5) CSXT must also perform refueling, along with appropriate safeguards, outside of waters of the United States. (*Id.* at 5.) And blasting must not occur in or adjacent to waters of the United States unless necessary, but only after further consultation with the Government. (*Id.* at 5.)

On the North Carolina side, the Corps' Wilmington District is involved with the Rebuild. CSXT is currently refraining from performing certain work below the high-water mark in North Carolina until an additional emergency authorization, in the form of an emergency permit, is provided.

Additionally, CSXT plans to generally pause the Rebuild from approximately November 24, 2024, through December 1, 2024, for Thanksgiving. CSXT anticipates only performing minimal recovery work during that time period and intends for it to be away from any waters.[3]

## II. LEGAL STANDARD

A party seeking a temporary restraining order relief "faces an exceedingly high burden." *Mahmoud v. Knight*, 102 F.4th 191, 201 (4th Cir. 2024). A temporary restraining order "is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555

---

[3] The only work that CSXT anticipates being done during that time is (1) installing lighting at Poplar Creek, and (2) repairing/paving some local roads. The lighting at Poplar Creek will require workers to be near the water but not in it. The paving will not occur near the water.

U.S. 7, 24 (2008). It "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22.

A plaintiff seeking injunctive relief through a temporary restraining order must demonstrate that "(1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm absent injunctive relief, (3) the balance of equities tips in its favor, and (4) the injunction would be in the public interest." *USA Farm Labor, Inc. v. Su*, 694 F. Supp. 3d 693, 701 (W.D.N.C. 2023) (Reidinger, J.) (denying temporary restraining order and preliminary injunction).

### III. ARGUMENT

#### A. Plaintiffs' Request for a Temporary Restraining Order Should Be Denied Until Such Time As All Interested Parties Can Fully Heard On The Merits Through An Appropriate Briefing Schedule.

While not mentioned in the Motion, the Complaint acknowledges that the Government has been collaborating with CSXT on the Rebuild since at least October 15, 2024. (*See* Compl. ¶ 119.) The Complaint also acknowledges that CSXT has been performing work for "weeks." (Compl. ¶ 93.) In short, Plaintiffs' request for extraordinary relief within 42 hours of filing should be denied as a problem of their own making.

In *Sierra Club v. United States Army Corps. of Engineers*, the Middle District of Florida denied a temporary restraining order challenging the Corps' issuance of a permits under the National Environmental Policy Act, the Council on Environmental Quality's implementing regulations, Section 404 of the Clean Water Act, and Least Environmentally Damaging Practical Alternative guidelines as violative of the Administrative Procedures Act. 2020 WL 3268228, *1 (M.D. Fla. Mar. 16, 2020). The permit authorized construction of a road extension. *Id.* Plaintiffs initially sought an *ex parte* temporary restraining order to "halt construction" of the road extension. *Id.* at *2. But the Court denied this request finding that plaintiffs "had created their own emergency

8

by waiting to file the Motion until forty-eight days after the Permit was issued and twenty-four days after groundbreaking." *Id.* Plaintiffs also "failed to establish a harm so immediate and irreparable that it could not wait until all parties could be heard on the matter." *Id.*

Just as in *Sierra Club*, Plaintiffs here have "created their own emergency" by sitting on their hands, and the instant Motion should similarly be denied. As the Complaint acknowledges, collaboration and consultation regarding the work to swiftly address this natural disaster has been ongoing for many weeks. Plaintiffs have been well aware of this. They have posted vociferously about it on social media. For example, American Whitewater posted an article on its website about the work two weeks before filing the instant Motion. *See* Don't Let Railroad Rebuild Destroy the Nolichucky Gorge (Updated X2), https://americanwhitewater.org/content/Article/view/article_id/OzuqNQSj9cK0ootdD4qCs/ (November 6, 2024).

The response to this enormous natural disaster is complex, with multiple governmental agencies involved that are working cooperatively with CSXT to get this important piece of National infrastructure repaired. There are daily developments in both North Carolina and Tennessee. Granting of this belated Motion would grind the Rebuild to a halt.

Moreover, circumstances continue to change day-to-day. For example, Plaintiffs filed their Motion at approximately 5 p.m. on November 20, 2024. But just an hour later, CSXT received additional work parameters on the Rebuild from the Corps' Nashville District. In fact, these new parameters directly addressed certain concerns of Plaintiffs—including any impact on the Appalachian elktoe and Virginia spiraea. (*See* Exhibit 1 at 4-5.)

9

Just as in *Sierra Club*, the Court should deny Plaintiffs' Motion for a temporary restraining order and allow an appropriate briefing schedule on the motion for preliminary injunction so that all parties may be heard on the merits.

### B. Plaintiffs are not likely to succeed on the merits.

#### 1. Plaintiffs' request for a TRO is moot.

Plaintiffs' request is simply to halt the previous emergency directives. But as described above, there have been developments and changes in the hours since Plaintiffs filed their Motion. Plaintiffs' requests are based on outdated requirements, as the Corps has increased parameters related to the Rebuild. (*See* Exhibit 1 at 3-5.) The issues raised in the Motion are no longer current. They are no longer live and now moot. *See Caddo Nation of Okla. v. Wichita & Affiliated Tribes*, 877 F.3d 1171, 1177 (10th Cir. 2017) (noting that temporary restraining order that can have no "present-day effect" is "moot" (quoting *Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1257 (10th Cir. 2004)).

#### 2. Federal law preempts Plaintiffs' claims.

The Supreme Court "repeatedly has recognized the preclusive effect of federal legislation" in the area of railroad regulation. *City of Auburn v. United States*, 154 F.3d 1025, 1029 (9th Cir. 1998). This court is no different. *See, e.g.*, *Lee v. Norfolk S. Ry. Co.*, 912 F. Supp. 2d 375, 379 (W.D.N.C. 2012) (Reidinger, J.) (holding that Railway Labor Act preempted discrimination claims and noting that congressional purpose behind Act was "to promote stability in labor-management relations" in the rail industry (quoting *Hawaiin Airlines, Inc. v. Norris*, 512 U.S. 246, 252-53 (1994)).

Particularly relevant here is the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"). *See* 49 U.S.C. § 10101. With the enactment of ICCTA, Congress intended to

"significantly reduce state and local regulation of railroads." *Maynard v. CSX Transp., Inc.*, 360 F. Supp. 2d 836, 839 (E.D. Ky. 2004). In that law, Congress established the Surface Transportation Board ("STB"), *see* 49 U.S.C. §§ 701(a), 702, granting it authority to regulate all aspects of railroad operations. This regulation is broad, as the STB's jurisdiction is "exclusive" and "preempt[s] the remedies provided under ***Federal or state law***." *Id.* § 10501(b) (emphasis added). ICCTA preempts remedies related to the "construction and/or maintenance of the tracks and crossings." *Maynard*, 360 F. Supp. 2d at 843; *see In re Katrina Canal Breaches Consol. Litig.*, 2009 WL 224072, at *6-*7 (E.D. La. Jan. 26, 2009) (ICCTA preempts negligence claims relating to design and construction of track and roadbed).

What Plaintiffs seek to do here is exactly what the ICCTA preempts—the regulation of railroad construction and maintenance of tracks. As described above, the Rebuild provides for the construction and maintenance of CSXT's tracks—specifically, getting this important infrastructure back up and running. Plaintiffs' Motion seeks a remedy by environmental organizations, not even governmental entities, ***stopping*** such construction and maintenance of railroad tracks. Such a remedy would clearly and impermissibly interfere with CSXT's construction and maintenance of its tracks; accordingly, it is preempted.

### C. Plaintiffs will not suffer irreparable harm.

Plaintiffs will suffer no irreparable harm. Their concern is with purported impacts to the environment, but the fact remains that governmental entities are working cooperatively and consulting with CSXT throughout the Rebuild. This includes boots-on-the-grounds visits with Government representatives. As described above, they have provided guidance and directives with respect to CSXT's work to prevent and mitigate environmental harms.

### D. The balance of harms and public interest weighs against granting injunctive relief.

Plaintiffs wrongly assert that the balance of harms weighs in favor of a temporary restraining order.

Every day, eight trains operate over the Blue Ridge Subdivision lines. (Sparks Decl. ¶ 7.) Approximately 14 million gross tons of freight moves through the Blue Ridge Subdivision each year, rendering it a critical route in the CSXT network and the Nation's rail system. (*Id.* ¶ 6.) This tonnage represents significant annualized revenue. (*Id.*) Repairs, which have already cost CSXT significant sums, are critical to bringing the Blue Ridge Subdivision back into working order. Not only that, but CSXT has **relied on** governmental cooperation and consultation to expend these funds. *See Ry. Lab. Executives' Ass'n v. Wheeling Acquisition Corp.*, 736 F. Supp. 1397, 1405 (E.D. Va. 1990) ("Wheeling has made significant financial investments, estimated at $300,000, in its preparation to begin railroad operations; and N & W has taken many steps to effectuate its withdrawal from the property. The lines' shippers will also be adversely affected by an injunction. Finally, if the Court were to grant the TRO until the dispute could be otherwise resolved, the delay would likely destroy the transaction's viability."); *id.* at 406 ("Since February, 1990, Wheeling has expended substantial time, effort and resources in preparation for its assumption of the rail lines' operations. Prospective Wheeling employees have left previous employment, relocated their homes, and made other costly decisions in reliance on this transaction's consummation. And, as noted above, the shippers' interests in continuing their operations militate against hindering completion of this transaction.").

If the Rebuild is enjoined, future shipments through the Blue Ridge Subdivision will continue to be rerouted by an average of 400 miles and up to 550. (Sparks Decl. ¶ 17.) This will result in tens of millions of additional route miles annually. (*Id.*) The estimated cost for these

reroutes—including miles, handlings, extra crew, fuel, among other considerations—is estimated to be tens of millions of dollars impacting the CSXT Rail Network.  (*Id.* ¶ 20.)  Additional days will only serve to drive this estimation higher.  (*See id.*)

Plaintiffs take a myopic view of the harms suffered by CSXT here, claiming only that it suffers only "temporary monetary harm[]."  But the harm is not just financial, it is human too.  CSXT employees have been furloughed given the destruction to the Blue Ridge Subdivision.  (*Id.* ¶ 19.)  Still other employees have transferred to other areas throughout CSXT's network during this outage.  (*Id.*)

The public interest favors continued work.  As the Supreme Court has recognized, the railway industry performs an important public service, so disruption is of public import.  *See Va. Ry. Co. v. Sys. Federation No. 40*, 300 U.S. 515, 552 (1937) ("The peaceable settlement of labor controversies, especially where they may seriously impair the ability of an interstate rail carrier to perform its service to the public, is a matter of public concern."); *see also Columbia Ry., Gas & Elec. Co. v. State of South Carolina*, 27 F.2d 52, 56 (4th Cir. 1928) ("[R]ailroads and street car companies as a rule are distinguishable from other corporations in that they are public service corporations, engaged in the business of transporting passengers by rail.  This is a matter peculiarly of public interest and importance, in that whole cities and communities are dependent upon the facilities afforded for the carrying on of their daily activities . . ."). And continued disruption, sought to be considerably ***lengthened*** by Plaintiffs, would ***harm*** the public interest. *See Renewable Water Res. v. CSX Transp. Inc.*, No. 6:21-CV-00673-DCC, 2021 WL 5918628, at *3 (D.S.C. Mar. 11, 2021) ("The public has an overwhelming interest in the safe and uninterrupted operation of the nation's railroad lines, including, more specifically, Defendant's subject section of track here.  Indeed, in the Court's consideration of this motion, this public interest is predominant among

the reasons why the granting of the requested relief is appropriate under these circumstances."); *see also Polk v. Amtrak Nat'l R.R. Passenger Corp.*, No. 21-CV-01740-LKG, 2022 WL 2304678, at *5 (D. Md. June 27, 2022) ("The United States Courts of Appeal for the Fourth Circuit has recognized that federal policy favoring arbitration 'has special importance in the rail and air industries, where failure to resolve labor disputes in a 'prompt and orderly' manner may 'interrupt[] . . . commerce' and thus adversely affect the public interest in traveling and shipping.'") (quoting *Air Line Pilots Ass'n v. United States Airways Grp.*, 609 F.3d 338, 341 (4th Cir. 2010)), *aff'd*, 66 F.4th 500 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 553 (2024); *CSX Transp., Inc. v. United Transp. Union*, 86 F.3d 346, 349 (4th Cir. 1996) ("While both sides may thus contest the particulars of a proposed implementing agreement before an arbitrator, the arbitrator's 'final, binding, and conclusive' decision prevents either the union or the railroad from holding the nation's transportation system hostage to its aims."); *I.C.C. v. Baltimore & Annapolis R. Co.*, 398 F. Supp. 454, 464 (D. Md. 1975) (recognizing "the importance of uninterrupted rail transportation service in the nation's economy"), *aff'd*, 537 F.2d 77 (4th Cir. 1976). Indeed, the Rebuild is expected to generate jobs, boost local economies devastated by Hurricane Helene, and generate significant tax revenue, (Sparks Decl. ¶ 27), with the expected capital cost alone exceeding $200 million, (*id.* ¶ 15).

As described above, the Blue Ridge Subdivision is a critical cog in the Nation's rail system. Further significant outage will impact the Nation's economy based on required rerouting through delays of shipments of critical consumer and industrial goods. The Nation, not just CSXT, is impacted by the continued outage of CSXT's railways. The public has significant interest in bringing the Blue Ridge Subdivision back up and running.

### E. If the Court is inclined to grant the TRO, Plaintiffs should post a significant bond.

Federal Rule of Civil Procedure 65(c) requires Plaintiffs to post bond "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." In the event that Plaintiffs prevail in gaining a temporary restraining order but ultimately fail to prevail, such amount should be significant.

As noted above, rerouting alone is estimated to cost CSXT tens-of-millions of dollars during the Rebuild. (Sparks Decl. ¶ 20.) The Rebuild is currently estimated to take months and a temporary restraining order would greatly increase these expenditures. (Sparks Decl. ¶ 14.) Accordingly, Plaintiffs should post a significant bond.

## IV. CONCLUSION

For the reasons set forth above, the Court should deny Plaintiffs' requested relief.

Date: November 22, 2024                    Respectfully submitted,

/s/ W. Dixon Snukals
W. Dixon Snukals
MCGUIREWOODS LLP
N.C. Bar No. 48088
501 Fayetteville Street, Suite 500
Raleigh, NC 27609
(919) 755-6679
(919) 755-6699 (facsimile)

Eugene E. Mathews
MCGUIREWOODS LLP
V.A. Bar No. 36384
*Pro hac vice forthcoming*

Davis M. Walsh
MCGUIREWOODS LLP
V.A. Bar No. 84585
*Pro hac vice forthcoming*
800 E. Canal St.
Richmond, VA 23219

(804) 775-7791
(804) 698-4673 (facsimile)
dwalsh@mcguirewoods.com

*Counsel for Defendant*
*CSX Transportation, Inc.*

## ARTIFICIAL INTELLIGENCE ("AI") CERTIFICATION

Pursuant to this Court's July 22, 2024 Order In Re: Use of Artificial Intelligence, I hereby certify the following:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg.

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

/s/ W. Dixon Snukals
W. Dixon Snukals
MCGUIREWOODS LLP

# CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2024, I electronically filed the foregoing Opposition with the Clerk of the Court for the Western District of North Carolina using the CM/ECF system, which will cause a Notice of Electronic Filing to be sent to all counsel of record, including the following:

| *For Plaintiffs* | *For Defendants* |
|---|---|
| J. Patrick Hunter<br>Sam Evans<br>Clara J. Derby<br>SOUTHERN ENVIRONMENTAL LAW CENTER<br>48 Patton Ave., Suite 304<br>Asheville, NC 28801-3321<br>phunter@selcnc.org<br>sevans@selcnc.org<br>cderby@selcnc.org | Martha C. Mann<br>United States Department of Justice<br>Environmental & Natural Resources Division<br>P.O. Box 7611<br>Washington, D.C. 20044<br>martha.mann@usdoj.gov<br><br>Elizabeth A. Kirby<br>United States Department of Justice<br>Environmental & Natural Resources Division<br>Wildlife & Marine Resources Section<br>Washington, D.C. 20044-7611<br>elizabeth.kirby@usdoj.gov |

/s/ W. Dixon Snukals
W. Dixon Snukals
N.C. Bar No. 48088
501 Fayetteville Street, Suite 500
Raleigh, NC 27609
(919) 755-6679
(919) 755-6699 (facsimile)
wsnukals@mcguirewoods.com