# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION

AMERICAN WHITEWATER and
AMERICAN RIVERS,

       Plaintiffs,

       v.

UNITED STATES ARMY CORPS
OF ENGINEERS, UNITED
STATES FOREST SERVICE, and
UNITED STATES FISH AND
WILDLIFE SERVICE,

       Defendants.

_____/

Case No. 1:24-cv-00284-MR-WCM

## FEDERAL AGENCIES' OPPOSITION TO PLAINTIFFS'
## MOTION FOR TEMPORARY RESTRAINING ORDER

Defendants the United States Army Corps of Engineers ("Corps"), United

States Forest Service ("Forest Service"), and United States Fish and Wildlife Service ("FWS") (collectively, "the Agencies") provide the following response in opposition to Plaintiffs' motion for a temporary restraining order, Doc. 5.[1]

## INTRODUCTION

In the aftermath of the widespread damage caused by Hurricane Helene, CSX Transportation ("CSX") is working to repair portions of its railroad tracks in North Carolina and Tennessee that were damaged by the storm. Plaintiffs claim that they do not seek to prevent the expedited rebuild of the CSX line, but that the work is proceeding under "unlawful approvals" by the Agencies. Plaintiffs request that the Court temporarily enjoin the purported approvals while they seek review.

Plaintiffs' motion should be denied. First, there are no final agency actions taken by the Agencies for the Court to review or enjoin. The Agencies are coordinating with CSX, which is engaged in an ongoing permitting process with both the Wilmington and Nashville Corps Districts. But the Agencies have made

---

[1] Plaintiffs state that they seek "a temporary restraining order and a preliminary injunction." Doc. 5 at 1. In this filing, the Agencies respond to the motion only to the extent that it seeks a temporary restraining order. Undersigned counsel have not been able to confirm that the Agencies have been served under Rule 4(i), but the Agencies are currently reviewing the Complaint. The Agencies will file a response to the motion for preliminary injunction no later than 14 days after receiving the motion unless the Court orders otherwise. *See* Local Rule 7.1(e).

In addition, in responding to Plaintiffs' motion, the Agencies do not waive any defenses it may bring in a responsive pleading under Rule 12.

no final determinations as to what portions of CSX's activities are covered under existing nationwide authorizations or permits, what portions are exempt from permitting, and what portions require an individual permit. In addition, Plaintiffs' claims of irreparable harm are speculative at best. Indeed, to the extent Plaintiffs believe CSX's activities are not authorized under the Clean Water Act or the Endangered Species Act, they could have initiated citizen suits against CSX to enforce those laws. The public interest would not be best served by interfering with the Agencies' efforts to provide expeditious assistance to regulated entities consistent with the Agencies' authorities. Instead, the Court should allow the Agencies to complete ongoing conferral and permitting processes.

## BACKGROUND

### I. FACTUAL BACKGROUND

Hurricane Helene made landfall on September 26, 2024, and traced a disastrous path of more than 600 miles from Florida to Virginia. It has become one of the deadliest storms in North Carolina, with over 230 reported deaths. Some estimates say the storm caused $250 billion in damages to the Southeast. In North Carolina and Tennessee, landscapes were most impacted by heavy rain, flash flooding, landslides, and downed trees. Areas received record rainfall and rapidly rising water levels overwhelmed drainage systems, leading to widespread flooding.

Debris flows and landslides have forever altered the topography. Helene caused significant damage to roads, trails, infrastructure, and natural resources.

In addition to their work assessing the emergency response missions, the Agencies have worked to aid those conducting repairs in the areas regulated by the Agencies. CSX is one entity that the Agencies have engaged with as the company attempts to repair sections of the rail line that were damaged or washed away.

In their Complaint, Plaintiffs assert that the Agencies have "unlawfully approv[ed]" CSX's work. Plaintiffs allege that the Corps has "authorized" work in the Nolichucky River Gorge in violation of the Rivers and Harbors Act (Claim 1) and Clean Water Act (Claim 2); that Forest Service has authorized work in the Pisgah and Cherokee National Forests in violation of the Forest Service Organic Act and National Forest Management Act (Claim 3); that the Corps and Forest Service "approvals" violate the National Environmental Policy Act (Claim 4); and FWS "determination" in connection with Corps "authorizations" violates the Endangered Species Act (Claim 5). Doc. 1 at 34-43. Plaintiffs seek review under the Administrative Procedure Act ("APA"). *Id.* ¶ 9 and 34-43.

## II. STATUTORY AND REGULATORY FRAMEWORK

**A.** **The Rivers and Harbors Act.** Section 10 of the Rivers and Harbors Act prohibits construction of any structure in any navigable river or waterway

without authorization by the Corps. 33 U.S.C. § 403. Its purpose is to safeguard navigable waters against unauthorized erection of dams, obstructions to navigability, or other structures. *Id.* The Corps' jurisdiction under the Act extends laterally to the entire water surface and bed of a navigable waterbody, which includes all the land and waters below the ordinary high water mark. 33 C.F.R. § 329.11(b). Structures or work outside the limits of navigable waters also require a section 10 permit if the structure or work would affect the course, location, or condition of the water body. *Id*. § 322.3(a). The Corps may authorize activities by issuing general permits (nationwide and regional general permits) or individual permits. *Id.* § 325.5. If an activity is not authorized by nationwide or regional permit, or otherwise exempt, an individual permit is required.

  **B.**   **The Clean Water Act.** The Clean Water Act is designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To accomplish these objectives, the Act prohibits the discharge of any pollutant by any person to navigable waters[2] except as authorized by section 404 of the Act, 33 U.S.C. § 1344, or other provisions not applicable here. 33 U.S.C. § 1311(a). Section 404(a), 33 U.S.C. § 1344(a), authorizes the Secretary of the Army, acting through the Corps, to issue permits for the discharge

---

[2] "Navigable waters" are "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

of dredged or fill material into jurisdictional waters at specified sites. The Chief of Engineers is authorized to issues nationwide permits, and District and Division Engineers may issue regional general permits and individual permits for activities that do not fall under a nationwide or regional permit. 33 U.S.C. § 1344(e); 33 C.F.R. Parts 325 and 330, § 325.2(e)(2). Section 404(f) also exempts certain activities from permitting requirements. *Id.* § 1344(f). One activity exempt from permitting is discharge of dredged or fill material "for the purpose of maintenance, including emergency reconstruction of recently damaged parts, of currently serviceable structures such as dikes, dams, levees, groins, riprap, breakwaters, causeways, and bridge abutments or approaches, and transportation structures." *Id.* § 1344(f)(1)(C).

  **C. The National Environmental Policy Act.** Congress enacted NEPA to focus governmental and public attention on potential environmental effects from proposed "major Federal actions." 42 U.S.C. § 4332(2)(C). NEPA is "essentially procedural." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978). It "does not mandate particular results" nor does it "impose substantive environmental obligations." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989). To meet NEPA's purposes, agencies prepare an environmental impact statement ("EIS") for any "major [f]ederal

actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). If the significance of any potential effect is not readily apparent, agencies may prepare an Environmental Analysis ("EA")—a more concise document—to determine whether an EIS is necessary. 33 C.F.R. Pt. 325, App. B. ¶ 7; 40 C.F.R. § 1501.5.2 If an agency issues a finding of no significant impact, no EIS is required. 40 C.F.R. § 1508.13.

NEPA does not provide a private right of action. A party alleging agency noncompliance with NEPA must sue under the APA. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894, (1990).

**D.** **The National Forest Management Act.** Under the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600-14, the Forest Service manages Forest Service lands at two levels: the forest level and the individual project level. *See* 16 U.S.C. § 1604; *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729-30 (1998). At the forest level, the Forest Service develops a forest plan, which is a broad, long-term planning document. A forest plan establishes planning goals and objectives for managing forest resources. 16 U.S.C. § 1604(g)(1), (3). At the project level, site-specific projects must be consistent with the applicable forest plan, or the forest plan must be amended. *Id.* § 1604(i).

**E.**     **The Endangered Species Act.** The Endangered Species Act ("ESA")

provides a conservation program that requires FWS to list species that meet the

definition of endangered or threatened and to designate critical habitat for those

species. 16 U.S.C. § 1533(a). Listed species are afforded certain protections under

the ESA. Section 7 of the ESA directs federal agencies to ensure, in consultation

with FWS, that any action they authorize "is not likely to jeopardize the continued

existence of any endangered species or threatened species or result in the

destruction or adverse modification" of designated critical habitat. 16 U.S.C.

§ 1536(a)(2). If an agency decides that a proposed action is likely to adversely

affect a listed species or critical habitat, formal consultation is required. 50 C.F.R.

§ 402.14(b)(1). At the conclusion of the process, FWS issues a biological opinion

("BiOp") that sets forth its opinion on whether the proposed action is likely to

"jeopardize the continued existence of" any listed species or destroy or adversely

modify designated critical habitat and whether an incidental take is reasonably

certain to occur. 16 U.S.C. § 1536(b)(3); 50 C.F.R. §§ 402.14(g)–(h), 402.46.

The ESA regulations also recognize that, in some circumstances, the usual

procedures for consultation may not be feasible and agencies may need to consult

in an expedited manner. 50 C.F.R. § 402.05(a). In "situations involving acts of

God, disasters, casualties, national defense or security emergencies, etc.,"

consultation is conducted through alternative procedures that FWS deems

"consistent with the requirements" of Section 7. *Id.* The ESA Handbook specifies

that FWS's "role is to offer recommendations to minimize the effects of the

emergency response action on listed species or their critical habitat (the informal

consultation phase)." U.S. Fish & Wildlife Serv., *Procedures for Conducting*

*Consultation and Conference Activities under § 7 of ESA* (Mar. 1998) ch. 8.2(A).

Once the emergency situation is "under control," the agency must initiate formal

consultation "as soon as practicable." 50 C.F.R. § 402.05(b). At that time, the

agency "shall submit information on the nature of the emergency action(s), the

justification for the expedited consultation, and the impacts to endangered or

threatened species and their habitats." *Id.* FWS evaluates such information and

issues a BiOp that includes the information and recommendations given during the

initial, informal phase of the emergency consultation. *Id.*

     **F.**    **The Administrative Procedure Act.** "The APA waives the federal

government's sovereign immunity for a limited set of suits, brought by 'a person

suffering legal wrong because of agency action' to obtain relief 'other than money

damages.'" *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 430 (4th Cir.

2019) (quoting 5 U.S.C. § 702). Judicial review under the APA is limited to "final

agency actions." 5 U.S.C. § 704. Subject matter jurisdiction is lacking if the

plaintiff fails to challenge a particular "agency action" that is fit for review. *See Invention Submission Corp. v. Rogan*, 357 F.3d 452, 460 (4th Cir. 2004). "The term 'action' as used in the APA is a term of art that does not include all conduct" on the part of the government. *Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013). For an agency action to be final and subject to review it must: (1) "mark the consummation of the agency's decisionmaking process . . . [a]nd . . . (2) be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted). "[I]t must not be of a merely tentative or interlocutory nature." *Id.*

## STANDARD OF REVIEW

A plaintiff seeking a temporary restraining order or a preliminary injunction must demonstrate that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm absent injunctive relief, (3) the balance of the equities tips in its favor, and (4) the injunction would be in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Id.* at 24. Failure to satisfy any one factor precludes relief. *Henderson ex rel. NLRB v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018). A plaintiff's entitlement to preliminary

injunctive relief is a matter of discretion with the Court. *See Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 595 (4th Cir. 2013).

## ARGUMENT

### I. Plaintiffs are not likely to succeed on the merits of their claims.

### A.    The Corps has not taken any final agency action subject to review.

In Claims 1 and 2, Plaintiffs seek judicial review of what Plaintiffs allege are "unlawful approvals" of CSX's activities under the Rivers and Harbors Act and the Clean Water Act. While the Corps has engaged at length with CSX, and the Wilmington and Nashville Corps Districts are engaged in separate permitting processes for CSX's work in North Carolina and Tennessee, the Corps has yet to take any final action under the Rivers and Harbors Act or the Clean Water Act.

With respect to the Rivers and Harbors Act, Plaintiffs expressly recognize that "CSX has not obtained a Section 10 permit" from either Corps District. Doc. 1 ¶ 139; *see also* Doc. 5-2 at 12. Plaintiffs also do not allege that the Corps has issued an individual permit to CSX under the Clean Water Act. Instead, Plaintiffs assert that the Corps Districts have issued "final approval" for its activities in the Nolichucky River. Doc. 5-2 at 10. Not so.

After Hurricane Helene, the Wilmington District sought and was granted authorization to implement special, alternative permit processing procedures for

any work requiring emergency action as a result of Helene. Declaration of Amanda Jones Fuemmeler ¶¶ 6-7. The District notified the public of the emergency permit application procedures. *Id.* ¶¶ 8-9. The District learned from CSX of its activities in North Carolina and recently inspected completed activities at the Poplar location. *Id.* ¶¶ 10, 13. The District advised CSX that corrective measures and/or restoration plans will be required to bring it into compliance for the purposes of obtaining an after-the-fact Clean Water Act permit which will include restoring the temporary impact areas once salvage operations have been completed.[3] *Id.* ¶ 13. CSX agreed to obtain after-the-fact authorization and to cease all in-water work in North Carolina pending CSX's identification of remaining regulated activities so that the District can assess whether aspects of the activities are exempt under section 404(f)(1)(b) of the Clean Water Act and to what extent the non-exempt activities will require a CWA section 404 permit. *Id.* Plaintiffs' acknowledgement that CSX is working on an after-the-fact permit application, Doc. 5-2 at 15, only underscores that the Wilmington District has yet to take any final action subject to judicial review.

With respect to the Nashville District, Plaintiffs contend that the Corps told

---

[3] Because the North Carolina section of the Nolichucky River has not been identified as a navigable water for purposes of the Rivers and Harbors Act pursuant to 33 C.F.R. § 329.14, the Wilmington District has not required section 10 permits for that portion of the River. Fuemmeler Declaration ¶ 11.

CSX it could continue reconstruction activities without Clean Water Act section

404 or Rivers and Harbors Act section 10 permits "and without any limitations on

the scope of the work or mitigation requirements." Doc. 5-2 at 5. This is patently

false. The Nashville District also provided the public with information about

emergency work following Hurricane Helene. Declaration of Casey Ehorn ¶ 4.

After being notified by CSX of its emergency rail track reconstruction work in

Tennessee, Mr. Ehorn, the East Branch Chief for the Regulatory Division of the

Nashville District, advised CSX that it may be exempt from permitting for some

repairs under Section 404(f) of the Clean Water Act, but that the Tennessee portion

of the Nolichucky River was a designated section 10 water for purposes of the

Rivers and Harbors Act. *Id.* ¶ 6. Mr. Ehorn added that the District was coordinating

with Corps regional officers to seek clarity on section 10 permitting processes. *Id.*

Mr. Ehorn stated that he was not directing CSX to cease work in Tennessee. *Id.*

This approach is consistent with Corps regulations that provide:

> In situations which would, if a violation were not involved, qualify for
> emergency procedures pursuant to 33 C.F.R. part 325.2(e)(4), the
> district engineer may decide it would not be appropriate to direct that
> the unauthorized work be stopped. Therefore, in such situations, the
> district engineer may, at his discretion, allow the work to continue,
> subject to appropriate limitations and conditions as he may prescribe,
> while the violation is being resolved in accordance with the
> procedures contained in this part.

33 C.F.R. § 326.3(c)(4).

Nashville District staff have continued to gather information about CSX's activities, conferred with other agencies, and met with concerned citizens. Ehorn Declaration ¶¶ 7-13. On November 20, the District sought additional information from CSX to determine what work was exempt under Clean Water Act section 404(f). *Id.* ¶ 14. The Nashville District is processing CSX's November 8 application for an after-the-fact permit for unauthorized activities, pursuant to 33 C.F.R. § 326.3, and requiring CSX to complete initial corrective measures, execute a tolling agreement, and provide a delineation to define the lateral limits of the Corps' jurisdiction. *Id.; see also id.* ¶ 16.

In sum, the Corps has yet to make a final determination as to which portions of CSX's work may be exempt and which portions will be addressed in an after-the-fact permit. Any initial determinations or advice the Corps has provided are interlocutory in nature and not the consummation of any decisionmaking process. *Cf. Altamaha Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 2010 WL 11607306, * 5-7 (S.D. Ga. 2010) (advisory email from the Corps is not final agency action).

**B. Plaintiffs have not identified any Forest Service final agency action.**

As Plaintiffs concede, Doc. 5-2 at 16, the Forest Service has not issued a special use permit, and thus there is no Forest Service final agency action reviewable by this Court. 5 U.S.C. § 704.

Any Forest Service actions with respect to CSX activities to date are not the consummation of the decisionmaking process for two reasons. *Bennett*, 520 U.S. at 177-78. First, CSX has not applied for special use permit, and thus Forest Service has not issued a decision on such an application. Declaration of Forrest Decker ¶¶ 9-12. Due to the emergency conditions caused by Helene, CSX is not required to apply for a special use authorization prior to temporarily occupying Forest Service land. 36 C.F.R. § 251.50(b). Forest Service regulations merely require that CSX apply for a special use authorization "at the earliest opportunity." *Id.* Any informal approvals would thus be "tentative or interlocutory" in nature, pending a formal special use permit application and decision. *Bennett*, 520 U.S. at 177-78.

Second, some CSX activities may not require a special use permit at all. Potentially relevant here, Forest Service regulations dictate that a special use permit is not required where the proposed use will have "nominal effects," 36 C.F.R. § 251.50(e)(1), or where another state or federal agency has jurisdiction over the proposed use. *Id.* § 251.50(e)(2). Absent an application for a special use permit, however, the Forest Service has no basis on which to make that final determination. In short, Plaintiffs' challenge against Forest Service is premature.

**C.    Forest Service complied with NFMA and NEPA.**

Even if the Court determines it has jurisdiction to review claims against the Forest Service, Plaintiffs are unlikely to succeed on the merits because the agency has complied with the law with respect to any CSX activities on Forest Service land. As a preliminary matter, it is important to clarify that CSX owns its railroad line—50 feet on either side of the centerline—in fee simple. It does not, as Plaintiffs argue, have a right-of-way over Forest Service land. CSX's operations on its own private land are outside Forest Service's purview.

Plaintiffs allege the Forest Service has violated the Organic Act by not issuing a special use permit, Doc. 5-2 at 16, but Forest Service emergency procedures allow CSX to temporarily occupy Forest Service land without first seeking a special use permit. 36 C.F.R. § 251.50(b) ("Nothing in this section prohibits the temporary occupancy of National Forest System lands without a special use authorization when necessary for the protection of life and property in emergencies . . . ."). CSX is only required to seek a special use permit "at the earliest opportunity." *Id.* CSX has submitted a draft proposal, which the Forest Service is in the process of reviewing, but CSX has not submitted an application that would trigger issuance of a special use permit or any applicable NFMA or NEPA review. Decker Declaration ¶¶ 9-12.

Forest Service regulations also allow for alternative NEPA arrangements in emergencies. 36 C.F.R. § 220.4(b). When emergency conditions require Forest Service action before preparing a NEPA analysis, the Forest Service may take actions "urgently needed to mitigate harm to life, property, or important natural or cultural resources," *id.* § 220.4(b)(1); consult with the Washington Office on "alternative arrangements" for NEPA if the environmental impacts are not likely to be significant, *id.* § 220.4(b)(2); or consult with the Council on Environmental Quality if the use is likely to have significant environmental impacts. *Id.* § 220.4(b)(3). Once Forest Service receives an application for a special use permit, it will conduct the appropriate environmental review.

**D.      Plaintiffs' NEPA claims are unlikely to succeed on the merits.**

Plaintiffs argue that the Corps should have prepared an EIS, or an EA, or should have consulted with the Council on Environmental Quality about "alternative arrangements" for NEPA compliance. Doc. 5-2 at 17-19 (citing 40 C.F.R. § 1506.11). Since the Corps has not issued any of the "approvals" Plaintiffs seek to challenge (*id.*) none of the NEPA duties Plaintiffs invoke have arisen.

Indeed, they may never arise. The Corps has issued several nationwide permits ("NWPs"), which prospectively authorize categories of activities that are expected to have limited environmental impact. NWP 3, for example, authorizes

(among other types of repair work) "the repair, rehabilitation, or replacement of . . . structures . . . destroyed or damaged by storms, floods, fire or other discrete events, . . .". Reissuance and Modification of Nationwide Permits, 86 Fed. Reg. 73522-01, 73573 (Feb. 25, 2022). The Corps performs its NEPA analysis *before* issuing (or re-issuing) NWPs. For projects that fall within a NWP's terms, no additional NEPA analysis is ordinarily required. *Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1054 (10th Cir. 2015); *Snoqualmie Valley Pres. All. v. U.S. Army Corps of Eng'rs*, 683 F.3d 1155, 1158 (9th Cir. 2012).

If, on the other hand, an NWP does not apply, individual permits may be required, and these may call for NEPA analysis. *Snoqualmie Valley Pres. All.*, 683 F.3d at 1158. As indicated in the Ehorn and Fuemmeler declarations, the Corps may determine that restoration work to be undertaken by CSX may proceed under NWP 3, or under an individual permit, or both. Ehorn Declaration ¶¶ 14 16; Fuemmeler Declaration ¶ 14. To the extent that work proceeds under NWP 3, NEPA compliance was completed before the NWP was issued. *See*, *e.g.*, *Abenaki Nation of Mississquoi v. Hughes*, 805 F. Supp. 234, 246–47 (D.Vt.1992), *aff'd*, 990 F.2d 729 (2d Cir.1993). If it is determined that an individual permit is required, the Corps will perform its NEPA analysis at that time. In all events, the Corps has not

made that determination, and thus has not taken a final action under the Clean Water Act or Rivers and Harbors Act.

Accordingly, Plaintiffs' NEPA allegations are beyond the Court's jurisdiction, because there is no final agency action for the Court to review under the APA.

### E. Any claims that the Corps or Forest Service have "failed to act" are irrelevant to Plaintiffs' motion.

Plaintiffs request that the Court "restrain" purported approvals by the Corps and Forest Service and a determination by the FWS. Doc. 5 at 2; Doc. 5-2 at 1, 7 (citing the standard for preserving the status quo). Plaintiffs do not seek an injunction requiring the Agencies to affirmatively take any specific action, which would not preserve the status quo. *E. Tennessee Nat. Gas Co. v. Sage*, 361 F.3d 808, 828 (4th Cir. 2004) (noting that mandatory preliminary injunctions do not preserve the status quo and should be granted only when the exigencies of the situation demand such relief). For this reason, Plaintiffs' alternative argument that it is likely to succeed in requiring the Agencies to take certain actions, Doc. 5-2 at 18-19, has no relationship to the preliminary relief it seeks.

Even if there were not a disconnect between the preliminary relief sought and the failure to act claim, Plaintiffs are not likely to succeed on their alternative claim. A claim to compel "unlawfully withheld or unreasonably delayed" agency

action is permissible under 5 U.S.C. § 706(1) only where Plaintiffs assert a "*discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). When an agency is not required to do something, courts "cannot compel the agency to act—let alone to act faster." *Gonzalez v. Cuccinelli*, 985 F.3d 357, 366 (4th Cir. 2021) (citing *Norton*, 542 U.S. at 63).

Because the issuance of a permit is a discretionary action, this Court cannot require the Agencies to take such actions under the APA. And the Court also cannot compel "compliance with broad statutory mandates" such as NEPA under section 706(1). *Norton*, 542 U.S. at 66; *Murray Energy Corp. v. E.P.A.*, 861 F.3d 529, 537 n.4 (4th Cir. 2017); *see also W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1242-43 (D.C. Cir. 2018) (declining to compel updated NEPA analysis under section 706(1)). The fact that an agency can complete NEPA review without subsequently "undertaking any judicially reviewable final action underscores the inappropriateness" of using a 706(1) to compel NEPA. *Ctr. for Biological Diversity*, 260 F. Supp. 3d at 27.[4]

G. **Plaintiffs are unlikely to succeed on their ESA claim.**

---

[4] Plaintiffs cite *Aberdeen & Rockfish R.R. Co. v. Students Challenging Regulatory Agency Procedures (S.C.R.A.P.)*, 422 U.S. 289, 319 (1975). Doc. 5-2 at 19. However, that case pre-dates the now well-settled law that NEPA claims must be brought under the APA. *Karst Env't Educ. and Prot., Inc. v. EPA*, 475 F.3d 1291, 1297 (D.C. Cir. 2007).

Claims challenging FWS's administration of the ESA are reviewable only under the APA. *Bennett*, 520 U.S. at 174-75. Thus, Plaintiffs' ESA claim is subject to the same final agency action requirement. A BiOp may be is a reviewable final agency action, as a BiOp with an accompanying incidental take statement may alter the legal regime. *Id.* at 178. But here, Plaintiffs do not identify any BiOp or any other final agency action taken by FWS.

First, FWS's November 7 letter (Doc. 5-17) is not an agency action, finding, or conclusion subject to judicial review. The Corps' invocation of the emergency consultation procedures, and FWS' response, is the *start* of the consultation process, not the conclusion. The legal consequences that result from a completed ESA Section 7 consultation, such as incidental take authorization, are not generally addressed in the informal stage of the emergency consultation process. *See* Declaration of Janet Mizzi ¶ 4. At this initial stage, FWS evaluates the request for consultation and provides recommendations. *Id.* ¶ 5. While the November 7 letter (Doc. 5-17) is a response and initial set of recommended conservation measures, the regulations require the Corps and FWS to conduct initial consultation procedures that will eventually lead to a BiOp where listed species or their critical habitat have been adversely affected. 50 C.F.R. § 402.05. Because the initiation of emergency consultation procedures does not constitute a final agency action

reviewable under the APA, there is no FWS action for the Court to review, much less to enjoin. *See, e.g.*, *Friends of Merrymeeting Bay v. U.S. Dep't of Com.*, 810 F. Supp. 2d 320, 327 (D. Me. 2011).

To the extent that there is any question as to whether the Agencies acted arbitrarily and capriciously by invoking these alternative procedures, the effects of Hurricane Helene fit squarely under the regulations defining emergency procedures. An "Act of God" is "[a]n overwhelming, unpreventable event caused exclusively by forces of nature, such as an earthquake, *flood*, or tornado." *Act of God*, Black's Law Dictionary (11th ed. 2019) (emphasis added). The general consensus is that the emergency procedures apply to situations that are unpredictable and unexpected in some way. *See, e.g.*, *Friends of Merrymeeting Bay*, 810 F. Supp. 2d at 328; *Wash. Toxics Coal. v. U.S. Dep't of Interior*, 457 F. Supp. 2d 1158, 1195 (W.D. Wash. 2006); *Defs. of Wildlife v. U.S. Army Corps of Eng'rs*, No. 1:20CV142, 2022 WL 18456141, at *6 (S.D. Miss. Nov. 22, 2022). The extent of catastrophic damage caused by Helene was unexpected and unpredictable. This unexpected catastrophe, and the resulting effects, is a perfect illustration of why expedited processes are sometimes warranted. This natural disaster caused record flooding and damage, leaving businesses without power, washing away portions of riverbanks and buildings, and completely flooding the

interiors of nearby buildings. *See* Mizzi Declaration ¶¶ 2, 5; Declaration of Mason Schmidt ¶ 10, Doc. 5-5. The Agencies' utilization of the ESA emergency procedures is squarely within the emergency situations the regulations describe.

## II.    Plaintiffs have not shown they are likely to suffer irreparable harm.

A plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. A showing of the "possibility of irreparable harm" is not sufficient. *Id.* A plaintiff "must make a clear showing of irreparable harm and the required irreparable harm must be neither remote nor speculative, but actual and imminent." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002) (cleaned up). Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with the characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief. *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997).

Here, Plaintiffs' claims of irreparable harm are vague and wholly speculative. To begin, observations of the damage resulting from Hurricane Helene and activities in and around the Nolichucky River afterward do not constitute assertions of irreparable harm. *See* Doc. 5-9 ¶¶ 12-25. Nor do descriptions of the River or inquiries made by Plaintiffs' declarants. *Id.* ¶¶ 7-9, 51-52. And broad

assertions that CSX's activities have "diminished . . . recreational, scenic, and ecological values," or "pose perhaps a greater threat" upstream in the Gorge, *id.* ¶ 53, provide no concrete explanation of any irreparable harm that Plaintiffs' members would suffer absent an injunction. Similarly, while sincere, expressions of "worr[y]" or "concern" about a declarant's personal life or financial well-being as a result of CSX's activities are not specific enough to establish irreparable harm. Doc. 5-6 ¶¶ 25-26; *see also* Doc. 5-5 ¶¶ 25-26; Doc. 5-25 ¶ 10; Doc. 5-11 ¶¶ 7-9. Plaintiffs' declarants provide no detailed estimates of financial or other losses that they will suffer if CSX must complete the ongoing Corps permitting process.

In the ESA context, irreparable harm must go beyond potential harm to individual members of a species and instead "must be measured at the *species level*" because the ESA explicitly permits FWS to exempt incidental take of individual members of a species as long as there is not undue adverse consequence at the population level. *See Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1315 (D. Or. 2011). Plaintiffs do not need to demonstrate an "extinction level" threat, but cannot show irreparable harm with an "analysis that is largely untethered from any sense of the magnitude of that impact to the overall population of that species." *See Pac. Coast Fed'n of Fishermen's Ass'ns v. Ross*, No. 1:20-cv-00431, 2020 WL 1699980, at *4-5 (E.D. Cal. Apr. 7, 2020).

Here, Plaintiffs have not carried their burden of proof to establish that either protected species—the Appalachian elktoe and the Virginia spirea—will suffer irreparable harm. Bare allegations of what may occur are insufficient. *See Bloodgood v. Garraghty*, 783 F.2d 470, 475–76 (4th Cir. 1986) (citation omitted) (finding that "bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur"). First, due to the devastation Helene caused, it is unclear whether there are any individual members of either species that remain in the area, including the critical habitat. *See* Mizzi Declaration ¶ 5. However, FWS is conservatively evaluating potential adverse effects that CSX's repairs may cause, and its November 7 letter reflects this approach by proscribing numerous measures to minimize potential impacts to individuals of the species that may be present. *See id*. Plaintiffs do not contend that the measures in the November 7 letter will not minimize potential impacts so as to avoid irreparable harm.[5] Plaintiffs' failure to take these measures into account further weakens their claim that imminent harm to either species is certain to occur absent an injunction. *See Comm. for a Constructive Tomorrow v. U.S. Dep't of Interior*, No. 24-cv-774, WL 2699895, at *4 (D.D.C. May 24, 2024) (finding plaintiff failed to show irreparable harm in part because they did not "take into

---

[5] The Corps' November 21 letter confirms that FWS's recommended measures will be incorporated into any permit authorizations. *See* Fuemmeler Declaration ¶ 16.

account extensive measures already in place to minimize potential harm to the [species] during construction"). At these early stages the amount of potential harm is speculative at best, and Plaintiffs have not met their burden.

### III. The balance of equities and the public interest do not support Plaintiffs' request for a temporary restraining order.

Courts must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief [and] [i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences." *Winter*, 555 U.S. at 24 (citations omitted). Those two inquiries merge with respect to the federal government. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

As explained above, the Agencies have taken no final agency action for the Court to review or enjoin. The public interest is best served by allowing the ongoing permitting processes and conferrals that the Agencies are undertaking with CSX to continue, which would ensure that CSX meets all statutory and regulatory requirements.

Respectfully submitted,

DENA J. KING
UNITED STATES ATTORNEY

*/s Gill P. Beck*
Gill P. Beck

Assistant United States Attorney
Chief, Civil Division
N.C. State Bar No. 13175
Room 233, U.S. Courthouse
100 Otis Street
Asheville, North Carolina  28801
(828) 271-4661
Gill.Beck@usdoj.gov

/s/ *Martha C. Mann*
MARTHA C. MANN
PETER DYKEMA
ELIZABETH KIRBY
READE WILSON
United States Department of Justice
Environmental & Natural Resources
  Division
P.O. Box 7611
Washington, D.C. 20044
martha.mann@usdoj.gov
peter.dykema@usdoj.gov
elizabeth.kirby@usdoj.gov
reade.wilson@usdoj.gov
Tel:  202.514.2664 (Mann)

## **CERTIFICATION**

Pursuant to the Standing Order of this Court entered June 18, 2024 and published to the Bar of the Western District on June 27, 2024, the undersigned hereby certifies:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this

document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 22nd day of November, 2024.

/s/ *Martha C. Mann*
MARTHA C. MANN