**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:24-cv-00284-MR-WCM**

| | | |
|---|---|---|
| **AMERICAN WHITEWATER and AMERICAN RIVERS,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **O R D E R** |
| | ) | |
| **THE UNITED STATES ARMY CORPS OF ENGINEERS, UNITED STATES FOREST SERVICE, and UNITED STATES FISH AND WILDLIFE SERVICES,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

**THIS MATTER** is before the Court on the Plaintiffs' Motion for Limited

Preliminary Injunction [Doc. 36].

## I.    BACKGROUND

The Plaintiffs American Whitewater and American Rivers ("the

Plaintiffs") bring this lawsuit pursuant to the Administrative Procedures Act

("APA" to challenge various actions by the United States Army Corps of

Engineers ("Army Corps" or "Corps"), the United States Fish and Wildlife

Service ("FWS"), and the United States Forest Service ("Forest Service") in

approving CSX Transportation ("CSX") to repair the damage to its rail line in

the Nolichucky River Gorge (or "the Gorge") caused by Hurricane Helene in September 2024.[1]  The Corps, FWS, and the Forest Service shall be referred to collectively as "the Agencies."

The Plaintiffs filed their original Complaint on November 18, 2024. [Doc. 1].  On November 20, 2024, the Plaintiffs filed a motion for temporary restraining order ("TRO") and preliminary injunction, asking the Court to issue a TRO no later than noon on Friday, November 22, less than 48 hours after they filed their motion.  [Doc. 5].  The Court denied the motion for TRO. [Doc. 24].  Thereafter, CSX was permitted to intervene.  [Text-Only Order entered Nov. 25, 2024].  The Plaintiffs withdrew their first motion for a preliminary injunction after the Agencies and CSX filed their respective responses in opposition.  [Docs. 29, 30, 31].

On January 28, 2025, the Plaintiffs filed a motion for leave to file a "supplemental complaint" [Doc. 34], which the Court granted [Text-Only Order entered Feb. 13, 2025].  The parties agree that this amended pleading, which the Court will refer to as the Plaintiffs' Amended Complaint, is now the operative complaint.  [See Doc. 35].  In their Amended Complaint, the

---

[1] Hurricane Helene was one of the most devastating storms in North Carolina history, causing an estimated $250 billion in damage to the Southeast.  In North Carolina and Tennessee, record rainfall and rapidly rising water levels lead to widespread flooding. Debris flows and landslides altered the topography.  The storm caused significant damage to roads, trails, infrastructure, and natural resources.

Plaintiffs allege that the Corps' exemption from permitting of certain activities by CSX violate the Clean Water Act (Claim 1); that the Corps' verifications of Nationwide Permits ("NWP") 3, 33, and 45 violate the Clean Water Act (Claim 2); that the Forest Service has authorized work on National Forest land in violation of the National Forest Management Act (Claim 3); and that the FWS's "determination" in connection with the Corps' verifications violates the Endangered Species Act (Claim 5).[2] [Doc. 38]. The Plaintiffs seek review of the Agencies' action under the Administrative Procedures Act. [Id.].

On February 7, 2025, the Plaintiffs filed the present motion, seeking a "limited" preliminary injunction. [Doc. 36]. Specifically, the Plaintiffs request an order which: (1) prohibits the removal of material from the Nolichucky River below the ordinary high-water mark except material which poses a risk to public safety, (2) prohibits the removal of rock and boulders from named rapids of the River, (3) prohibits fill in jurisdictional waters outside their pre-storm embankments as determined by the Corps, and (4) enjoins any recreational or commercial river closures of the River. [Id.]. The Agencies and CSX have responded [Docs. 39, 40], and the Plaintiffs have replied [Doc. 41]. Accordingly, this matter is ripe for disposition.

---

[2] The Plaintiffs' Amended Complaint does not set forth a "Claim 4."

## II.    STANDARD OF REVIEW

### A.    Preliminary Injunction Standard

To obtain temporary injunctive relief, a plaintiff must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) injunctive relief is in the public interest.  Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20 (2008).  Thus, in each case the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 542 (1987).  A plaintiff's entitlement to preliminary injunctive relief is a matter of discretion with the Court.  See Metropolitan Reg'l Info. Sys., Inc. v. American Home Realty Network, Inc., 722 F.3d 591, 595 (4th Cir. 2013).

### B.    APA Standard

"The APA waives the federal government's sovereign immunity for a limited set of suits, brought by 'a person suffering legal wrong because of agency action' to obtain relief 'other than money damages.'"  City of New York v. U.S. Dep't of Def., 913 F.3d 423, 430 (4th Cir. 2019) (quoting 5 U.S.C. § 702).

4

Judicial review under the APA is limited to a "final agency action." 5 U.S.C. § 704. "The term 'action' as used in the APA is a term of art that does not include all conduct" on the part of the government. Village of Bald Head Island v. U.S. Army Corps of Eng'rs, 714 F.3d 186, 193 (4th Cir. 2013). The APA defines "agency action" as a "agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act[.]" 5 U.S.C. § 551(13). "All of those categories involve circumscribed, discrete agency actions . . . ." Norton v. S. Utah Wilderness All., 542 U.S. 55, 62 (2004). Only an act, or "failure to act" with "the same characteristic of discreteness," is reviewable under the APA. Id. at 62-63.

## III. STATUTORY AND REGULATORY FRAMEWORK

### A. The Clean Water Act

The objective of the Clean Water Act ("CWA") is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To this end, the CWA prohibits the discharge of any pollutant by any person to navigable waters[3] except as authorized by section 404 of the CWA, 33 U.S.C. § 1344, or other provisions not applicable here, id. § 1311(a). Section 404(a) authorizes the Secretary of the Army,

---

[3] "Navigable waters" under the CWA are defined as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

acting through the Corps, to issue permits for the discharge of dredged or fill material into jurisdictional waters.  Id. § 1344(a).

The Corps issues two types of Section 404 permits: individual permits and general permits.  33 C.F.R. § 320.1(c).  As is pertinent here, general permits "are designed to regulate with little, if any, delay or paperwork certain activities having minimal impacts."  33 C.F.R. § 330.1(b).  General permits may only be promulgated and used for activities that are "similar in nature" and cause only "minimal adverse environmental effects."  33 U.S.C. § 1344(e)(1); see also 33 C.F.R. § 323.2(h)(1).  A "nationwide permit," or "NWP," is a general permit that applies nationwide.  33 C.F.R. § 330.1(b). The Chief of Engineers is authorized to issue NWPs, and District and Division Engineers may issue regional general permits and individual permits for activities that do not fall under a nationwide or regional permit.  33 U.S.C. § 1344(e); 33 C.F.R. Pts. 325 and 330, § 325.2(e)(2).

Every five years, and most recently in 2021, the Corps re-issues its nationwide permits with terms and conditions to ensure each permit meets the "similar in nature" and "no-more-than-minimal effects" requirements.  33 U.S.C. § 1344(e); 86 Fed. Reg. 73,522, 73,533 (Dec. 27, 2021).  No activity may be approved under a nationwide permit that does not satisfy all the

6

terms of that permit and the General Conditions that apply to all nationwide permits. 33 C.F.R. § 330.4(a).

The same nationwide permit "cannot be used more than once for a single and complete project." 33 C.F.R. § 330.6(c).  A "single and complete project" is defined, in pertinent part, as follows:

> Single and complete project means the total project proposed or accomplished by one owner/developer or partnership or other association of owners/developers.  For example, if construction of a residential development affects several different areas of a headwater or isolated water, or several different headwaters or isolated waters, the cumulative total of all filled areas should be the basis for deciding whether or not the project will be covered by an NWP.  For linear projects, the "single and complete project" (i.e., single and complete crossing) will apply to each crossing of a separate water of the United States (i.e., single waterbody) at that location; except that for linear projects crossing a single waterbody several times at separate and distant locations, each crossing is considered a single and complete project.

33 C.F.R. § 330.2(i).

The Corps' "verification" of an activity under a nationwide permit is a final agency action challengeable under the APA.  See Snoqualmie Valley Pres. All. v. U.S. Army Corps of Eng'rs, 683 F.3d 1155, 1159 (9th Cir. 2012).

Congress exempted certain activities from Section 404 permitting requirements.  See 33 U.S.C. § 1344(f).  One activity exempt from Section

404 permitting is the discharge of dredged or fill material "for the purpose of maintenance, including emergency reconstruction of recently damaged parts, of currently serviceable structures such as dikes, dams, levees, groins, riprap, breakwaters, causeways, and bridge abutments or approaches, and transportation structures." Id. § 1344(f)(1)(B).

**B.    The Rivers and Harbors Act**

Section 10 of the Rivers and Harbors Act ("RHA") prohibits work in any navigable river or waterway without authorization by the Corps.  33 U.S.C. § 403.  The Corps is authorized to issue nationwide permits under the RHA. 33 C.F.R. § 325.5(c)(2).

**C.    The National Forest Management Act**

Under the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600-14, the Forest Service manages Forest Service lands at the forest level and the individual project level.  See 16 U.S.C. § 1604; Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 729-30 (1998).  At the forest level, the Forest Service develops a forest plan, which is a broad, long-term planning document.  16 U.S.C. § 1604(g)(1), (3).  At the project level, site-specific authorizations must be consistent with the applicable forest plan, or the forest plan must be amended.  Id. § 1604(i).

## D. The Endangered Species Act

The Endangered Species Act ("ESA") requires the FWS to list and protect species that meet the definition of endangered or threatened and to designate critical habitat for those species "to the maximum extent prudent and determinable." 16 U.S.C. § 1533(a). Section 7 of the ESA directs federal agencies to consult with the FWS to ensure that any action they authorize, fund, or carry out "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. Id. § 1536(a)(2). If a proposed action is likely to adversely affect a listed species or critical habitat, formal consultation is required. 50 C.F.R. § 402.14(b)(1). At the end of formal consultation, the FWS issues a biological opinion ("BiOp") that states whether the proposed action is likely to jeopardize the continued existence of any listed species or destroy or adversely modify designated critical habitat and whether an incidental take is reasonably certain to occur. 16 U.S.C. § 1536(b)(3); 50 C.F.R. § 402.14(g)-(h). The BiOp's incidental take statement specifies terms and conditions that, if followed, a specified amount of take is exempted from the prohibitions of Section 9 of the ESA. Sierra Club v. U.S. Dep't of the Interior, 899 F.3d 260, 270 (4th Cir. 2018).

9

The FWS recognizes that, when agencies need to respond to certain emergencies, it may not be feasible to first observe the usual timing and procedures of the ESA consultation process. 50 C.F.R. § 402.05(a). Alternative, emergency procedures "consistent with" Section 7 requirements are utilized in "situations involving acts of God, disasters, casualties, national defense or security emergencies, etc." Id. During an emergency consultation process, the FWS "is to offer recommendations to minimize the effects of the emergency response action on listed species or their critical habitat (the informal consultation phase)." U.S. Fish & Wildlife Serv., Procedures for Conducting Consultation and Conference Activities under § 7 of ESA (Mar. 1998) ("Handbook") ch.8.2(A).[4] This "allow[s] action agencies to incorporate endangered species concerns into their actions during the response to an emergency." Id. ch.8.1. Once the emergency is "under control," the agency must initiate formal consultation "as soon as practicable." 50 C.F.R. § 402.05(b). To do so, the agency must give the FWS information about the emergency action and how recommendations were implemented, the impacts to listed species and their habitat, and the justification for the expedited consultation. Id.; Handbook ch.8.2(D). The

---

[4] This FWS Handbook is available online at https://www.fws.gov/media/endangered-species-consultation-handbook (last accessed Mar. 17, 2025).

FWS evaluates then will issue a BiOp that discusses the recommendations given during informal consultation, the agency's success in carrying out the recommendations, and take effects on the listed species. 50 C.F.R. § 402.05(b).

### E.    Army Corps Nationwide Permits

#### 1.    Nationwide Permitting Process

The Corps regulates activities through NWPs in three stages. First, for each issued NWP, the Corps conducts a predictive analysis to determine whether the adverse environmental impacts of the activities authorized under each NWP are no more than "minimal." 33 U.S.C. § 1344(e). Analysis of potential adverse effects consists of "reasoned predictions." Ohio Valley Env't Coal. v. Bulen, 429 F.3d 493, 501 (4th Cir. 2005). The Corps prepares appropriate documentation to satisfy applicable laws, like the ESA, 16 U.S.C. § 1536. The Corps further imposes additional terms through "General Conditions" that may be applicable to an NWP. 86 Fed. Reg. 2,744, 2,867 (Jan. 13, 2021). The Corps memorializes its analyses in a decision document for each NWP.

Second, the Division Engineer has "discretionary authority to modify, suspend, or revoke NWP authorizations . . . by issuing a public notice or notifying the individuals involved." 33 C.F.R. § 330.5(c)(1). He may exercise

this authority "whenever he determines sufficient concerns for the environment under the section 404(b)(1) Guidelines or any other factor of the public interest so requires, or if he otherwise determines that the NWP would result in more than minimal adverse environmental effects either individually or cumulatively." Id. § 330.4(e)(1); see id. § 330.1(d). Division Engineers prepare supplemental decision documents and may impose regional conditions to ensure the activities have minimal adverse effects and are in the public interest. 86 Fed. Reg. 2,744, 2745 (Jan. 13, 2021); 86 Fed. Reg. 73,522-01, 73,527 (Dec. 27, 2021); 33 C.F.R. §§ 330.5(c)(1)(iii), 330.1(d).

Third, some NWPs require prospective permittees to submit a pre-construction notification seeking verification from the Corps that their proposed activity complies with and is authorized by the NWP. 33 C.F.R. § 330.6(a); see id. § 330.1(e)(1). The District Engineer reviews the notification "and may add activity-specific conditions to ensure that the activity complies with the terms and conditions of the NWP" and that adverse impacts are no more than minimal. 33 C.F.R. §§ 330.1(e)(2), (3), 330.6(a)(3)(i); see also 86 Fed. Reg. 2,874-75.

### 2.    Nationwide Permit 3

NWP 3 authorizes the repair or replacement of structures destroyed or damaged by storms, floods, and other discrete events. 86 Fed. Reg. 73,522.

NWP 3 also authorizes general maintenance activities, including temporary structures and supporting work.  Id.

### 3.    Nationwide Permit 33

NWP 33 covers temporary structures, work, and discharges of dredged or fill material necessary for construction activities.  86 Fed. Reg 73,522. Discharge of dredged material is allowed if it will not cause more than minimal adverse environment effects.  Id. at 73,579.  After construction is completed, any temporary fill must be removed, dredged material must be returned to its original location, and affected areas must be restored to pre-construction elevation.  Id.

### 4.    Nationwide Permit 45

NWP 45 authorizes discharges of dredged or fill material into waters of the United States for activities associated with the restoration of upland areas damaged by storms, floods or other discrete events, including dredging or excavation in waters of the United States.  86 Fed. Reg. 73580-81. Restoration cannot exceed the ordinary high-water mark that existed before the damage occurred.  Id.  The District Engineer retains the right to determine the extent of the preexisting conditions and the extent of any restoration work authorized by this NWP.  Id.

13

### 5. Nationwide Permit General Conditions 16 and 18

General Condition 16 ("GC 16") states if the proposed activities occur in either (1) a component of the National Wild and Scenic River System, or (2) a "study river" while the river is in an official study status, the federal agency with direct management responsibility of the river must determine in writing that the activities will not adversely affect the Wild and Scenic River designation or study status. 86 Fed. Reg. 2,868.

General Condition 18 ("GC 18") states that any activity that "may affect" a listed species or critical habitat under the ESA requires Section 7 consultation analyzing the impacts of the activity. Id. at 2,868-69

## IV. DISCUSSION

### A. Likelihood of Success on the Merits

#### 1. NWP Verifications

The Plaintiffs allege that the Corps' verifications for Nationwide Permits 3, 33, and 45 violate the APA and the CWA in various ways. [Doc. 36-1 at 10-17]. The Court will address each of these arguments in turn.

##### a. "Single and Complete Project"

As an initial matter, the Plaintiffs allege that the Corps has unlawfully approved different portions of CSX's reconstruction project using the same nationwide permits. [Doc. 36-1 at 11-12]. The Plaintiffs contend that this is

14

unlawful because the Corps has verified the same nationwide permits "more than once for a single and complete project," in violation of 33 C.F.R. § 330.6(c).

To understand the Plaintiffs' argument, some factual background is in order. The Corps is divided into geographic districts: the United States is organized into eight divisions, and each division contains several subordinate districts, each of which oversees a distinct geographic area. The Tennessee portion of the Nolichucky River traverses through the jurisdiction of the Corps' Nashville District, while the North Carolina portion of the Nolichucky River traverses through the jurisdiction of the Corps' Wilmington District.

On January 3, 2025, the Corps' Wilmington District verified that CSX's proposed activities, work, and structures in the North Carolina portion of the Gorge are authorized under NWPs 3, 33, and 45. [Doc. 39-1: Wilmington Verification]. Seven days later, on January 10, 2025, the Corps' Nashville District verified that CSX's proposed activities, work, and structures in the Tennessee portion of the Gorge are authorized under those same permits. [Doc. 39-2: Nashville Verification]. These verifications require CSX to comply with the conditions of the NWPs and the special conditions included by each

District.  [See Doc. 39-1: Wilmington Verification at 3-4; Doc. 39-2: Nashville Verification at 4].

The Plaintiffs' § 330.6(c) argument is premised on the idea that CSX's reconstruction of its railroad line through the Nolichucky Gorge is a "single and complete project."  The Corps' implementing regulations define a "single and complete project" as "the total project proposed or accomplished by one owner/developer or partnership or other association of owners/developers." 33 C.F.R. § 330.2(i).  The Emergency Permit issued to CSX by the Corps, however, indicates that the reconstruction of the CSX line is considered a "linear transportation project as defined in the [Corps'] regulations."  [See Doc. 36-6: Emergency Permit at 20].  Section 330.2(i) explains, in pertinent part, that:

> For linear projects, the "single and complete project" (i.e., single and complete crossing) will apply to each crossing of a separate water of the United States (i.e., single waterbody) at that location; except that for linear projects crossing a single waterbody several times at separate and distant locations, each crossing is considered a single and complete project.

33 C.F.R. § 330.2(i).

Here, CSX's reconstruction of its railroad line involves "crossings" of multiple waters of the United States, including the Nolichucky River in both Tennessee and North Carolina; Mine Branch, Long, and Devils Creek in

16

Tennessee, the North Toe River in North Carolina, and a number of associated tributaries. [See Doc. 36-6: Emergency Permit at 35 ¶ 15; Doc. 39-1: Wilmington Verification at 2; Doc. 39-2: Nashville Verification at 2]. The work will also impact multiple crossings of the Nolichucky River itself. [See id.]. Pursuant to the regulations, each of these crossings is a "single and complete project." 33 C.F.R. § 330.2(i). Nevertheless, the Corps grouped these projects together by state. The Corps' decision to issue separate verifications for activities in each state allowed the Corps to align special conditions with both state-specific certifications and district-specific considerations. The Plaintiffs therefore have failed to demonstrate a likelihood of prevailing on their theory that CSX's reconstruction activities are a "single and complete project" and thus the permitting of the same violated § 330.6(c).[5]

---

[5] In any event, the Plaintiffs' interpretation of "single and complete project" would not change the outcome here. The prohibition on using "the same NWP… more than once for a single and complete project," 33 C.F.R. § 330.6(c), is intended to prevent an agency from "divid[ing] artificially a 'major Federal action' into smaller components to escape the application of NEPA to some of its segments," Crutchfield v. U.S. Army Corps of Eng'rs, 154 F.Supp.2d 878, 900 (E.D. Va. 2001) (citation omitted). Such segmenting concerns would arise where a NWP limits activities to specific acreage thresholds and a project is divided to avoid exceeding those limits. Those concerns do not exist here, as NWPs 3, 33, and 45 do not have acreage limits, and thus could cover all of CSX's activities in both States.

### b. "Currently Serviceable"

Next, the Plaintiffs contend that CSX's activities do not meet the terms of NWP 3 because CSX's railroad through the Gorge is not "currently serviceable." [Doc. 36-1 at 12].

NWP 3(a) authorizes the following activities:

(1) "The repair, rehabilitation, or replacement of any previously authorized, currently serviceable structure or fill, or of any currently serviceable structure or fill authorized by 33 CFR 330.3";

(2) "[T]he removal of previously authorized structures or fills";

(3) "[T]he removal of accumulated sediment and debris within, and in the immediate vicinity of, the structure or fill"; and

(4) "[T]he repair, rehabilitation, or replacement of those **structures or fills destroyed or damaged by storms, floods, fire or other discrete events**...."

86 Fed. Reg. 73,522, 73,573 (Dec. 27, 2021) (emphasis added).

Here, CSX is engaged in the "repair" and "replacement" of sections of its rail line that were "destroyed or damaged" by Hurricane Helene and the flooding associated therewith. NWP 3's authorization is not limited to only "currently serviceable structure[s]," nor could it: a structure that has been "destroyed or damaged by storms" would not likely be serviceable.

The Decision Document for NWP 3 confirms that the permit separately authorizes activities for "currently serviceable" structures *and* for structures that have been damaged or destroyed in a catastrophic event. As the document explains, "[t]he activities authorized by NWP 3 are similar in nature, because they are limited to the repair, rehabilitation, and replacement of currently serviceable structures or fills, **or** structures or fills damaged or destroyed by storms, floods (including tidal floods), fires, or other discrete events." [Doc. 36-17: NWP Decision Document (2021) at 112] (emphasis added). Because NWP 3 authorizes rebuilding of structures that are currently serviceable "or" that were damaged and destroyed by the hurricane, the Plaintiffs have failed to show a substantial likelihood of success on their claim that the Corps' verifications were unlawful because the rail line being repaired or replaced is not "currently serviceable."

### c.    NWP 45

The Plaintiffs contend that CSX's activities do not comply with two of the limits applicable to NWP 45 because it exceeds the contours of the embankment and will alter the pre-existing bottom contours of the River. As such, the Plaintiffs contend that the Corps' verification of the use of NWP 45 for CSX's activities was arbitrary and capricious and in violation of the CWA. [Doc. 36-1 at 14].

19

The Corps' verifications include express requirements that CSX comply with all conditions of NWP 45, which include (1) the condition that permanent fill work must not occur outside the original embankment footprint and (2) the condition that any permitted discharge of dredged material is limited to the amount necessary to restore the damaged uplands and should not significantly alter the bottom contours of the waterbody. [See Doc. 39-1: Wilmington Verification at 3; Doc. 39-2: Nashville Verification at 4]. The Plaintiffs therefore have failed to have to demonstrate that they are likely to succeed on a claim that the Corps has verified the use of NWP 45 for CSX's reconstruction in violation of the law. If the Plaintiffs have concerns that CSX is violating NWP 45's conditions, the proper avenue is a citizen suit pursuant to 33 U.S.C. § 1365(a)(1).

### d.    NWP 33

The Plaintiffs contend that "[b]ecause [NWPs 3 and 45] are inapplicable, [NWP] 33 is unavailable." [Doc. 36-1 at 15]. Because the Court concludes that the Plaintiffs have failed to demonstrate a likelihood of succeeding on the merits of their claims that NWPs 3 and 45 are unlawful, the Court similarly concludes that the Plaintiffs have failed to demonstrate a likelihood of succeeding on the merits of this claim as well.

### e. General Conditions

Next, the Plaintiffs contend that CSX's activities do not satisfy General Conditions 16 and 18, which are applicable to all nationwide permits. [Doc. 36-1 at 15-16].

While the Plaintiffs allege CSX's activities violate multiple General Conditions, the Plaintiffs are not challenging CSX's activities in this suit. Rather, they are challenging the Corps' authorizations. If the Plaintiffs wish to challenge CSX's activities as being unauthorized, this APA action is not the appropriate avenue to do so.

To the extent that the Plaintiffs are challenging the verifications issued by the Corps, they have failed to show that they are likely to succeed on such claims. The Plaintiffs contend that CSX's activities do not meet General Condition 16 because the Forest Service has not made a written determination about the impact of CSX's activities on "the Wild and Scenic River designation or study status." [Id. at 16]. However, such a determination is not required in this instance. General Condition 16 requires a written determination if the river is (1) located in a component of the National Wild and Scenic River System or (2) a river designated as a "study river" *in official study status*. 86 Fed. Reg. 2,868. The Nolichucky meets neither of these criteria. Although the Nolichucky suitability study was

21

completed, Congress has designated it only as a "potential addition: to the Wild and Scenic River System. See 16 U.S.C. § 1276(a)(45). Thus, the Plaintiffs have failed to demonstrate a likelihood of success of prevailing on their claim that CSX's activities violate General Condition 16 and therefore may not be approved with nationwide permits.

General Condition 18 states "[n]o activity is authorized under any NWP which 'may affect' a listed species or critical habitat, unless section 7 consultation addressing the consequences of the proposed activity on listed species or critical habitat has been completed." 86 Fed. Reg. 2,868-69. The Plaintiffs' argument implies that no NWPs could be verified until *formal* ESA Section 7 consultation is complete. [Doc. 36-2 at 16-17]. However, the FWS has developed an emergency consultation process, as discussed supra, which envisions that response activities proceed before concluding formal consultation. 50 C.F.R. § 402.05. The Agencies have presented evidence that before verifying that CSX's activities qualified for NWP coverage, the Corps' District Engineers determined that the ESA requirements were satisfied through the alternative procedures outlined in 50 C.F.R. § 402.05. Specifically, the Agencies have shown that the Corps has completed "informal consultation" as contemplated under step 8.2(A) of the FWS Handbook, and that once the emergency is under control, the Corps will

initiate formal consultation by preparing a biological assessment for FWS under step 8.2(B), which will result in FWS issuing a BiOp. [See Doc. 39-4: Wilmington Memo. for Record at 12; Doc. 39-5: Nashville Memo. for Record at 25]. Thus, the Plaintiffs have failed to demonstrate a likelihood of success of prevailing on their claim that CSX's activities violate General Condition 18 and therefore may not be approved with nationwide permits.

### 2. CWA Exemption

In its verifications, the Corps' Wilmington District found that certain activities—replacing culverts, rebuilding damaged segments of tracks, and recovery of rail tracks, ties and rail line materials—qualified as emergency reconstruction of recently damaged parts exempt from permitting under the CWA. [See Doc. 39-1: Wilmington Verification at 2].

The Plaintiffs claim that the Corps' determination in this regard is arbitrary and capricious, because (1) "the Gorge is not 'currently serviceable,'" (2) CXS's reconstruction activities change the "character, scope, or size of the original fill design," and (3) the "Nashville District has found that these same activities are not exempt." [Doc. 36-1 at 17-18].

As to the Plaintiffs' first argument, the statutory exemption also includes "emergency reconstruction of recently damaged parts" of transportation infrastructure, 33 U.S.C. § 1344(f)(1)(B), and thus applies to

23

CSX's emergency reconstruction, as explained supra. As for the Plaintiffs' second argument, the evidence presented by the Agencies indicates that no additional fill has been authorized beyond the rail line's footprint prior to the flood, and therefore the original fill design has not been altered. [See Doc. 39-1: Wilmington Verification at 2; Doc. 39-2: Nashville Verification at 2; Doc. 39-4: Wilmington Memo. for Record; Doc. 39-5: Nashville Memo. for Record]. Further, the Agencies have presented evidence that CSX's toe-road is a temporary structure that must be removed after construction and therefore will not change the original fill design. [Doc. 39-4: Wilmington Memo. for Record at 7; Doc. 39-5: Nashville Memo. for Record at 37]. As for the Plaintiffs' third argument, the Corps' Nashville District agreed that some of CSX's proposed activities were exempted by Congress from section 404 permitting requirements. [Doc. 39-2: Nashville Verification at 5; Doc. 39-5: Nashville Memo. for Record at 4-5]. The Corps Nashville District could not exempt these activities from permitting, however, because such activities are also subject to regulation under Section 10 of the Rivers and Harbors Act of 1899. The Nolichucky is a Section 10 water in Tennessee but not North Carolina [Doc. 39-5: Nashville Memo. for Record at 6], and these CSX's reconstruction activities are "work" in waters of the United States pursuant to Section 10. See 33 U.S.C. § 403. Thus, regardless of any potential CWA

24

exemption, the Nashville District was still required to permit these activities pursuant to their Section 10 jurisdiction.

In sum, the Court concludes that the Plaintiffs have failed to demonstrate a likelihood of success of prevailing on their claim that the Corps' invocation of a Clean Water Act exemption is arbitrary and capricious.

### 3.    FWS Section 7 Determination

The Plaintiffs next claim that FWS violated the APA by issuing a Section 7 determination that fails to comply with the requirements of the ESA.  [Doc. 36-1 at 18-21].

For an agency action to be final and subject to review it must: (1) "mark the consummation of the agency's decisionmaking process" and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow."  Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (internal citations and quotations omitted).  "[I]t must not be of a merely tentative or interlocutory nature."  Id.  A court may review and set aside a "final agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

Here, FWS and the Corps initiated emergency consultation under the ESA pursuant to 50 C.F.R. § 402.05(a).  FWS was able to make initial conservation recommendations within seven days of the Corps' request to

initiate emergency consultation. [Doc. 36-10: FWS Letter Nov. 7, 2024 at 3-4]. FWS has determined that its exercise of emergency consultation was "consistent with the requirements of sections 7(a)-(d) of the [ESA]," and FWS plans to issue an "after the fact" biological opinion. [See Doc. 36-10: FWS Letter Nov. 7, 2024 at 3].

The Plaintiffs have failed to identify a reviewable final agency action and are unlikely to succeed on their claim against FWS. First, the Plaintiffs have not identified any action marking the consummation of the decision-making process. FWS's Section 7 decision-making process ends when it issues its BiOp. 50 CFR § 402.05(b). The first, informal phase of the emergency consultation process is interlocutory by nature and thus does not meet the first Bennett prong. Second, Plaintiffs have not identified an action "by which rights or obligations have been determined, or from which legal consequences will flow." Bennett, 520 U.S. at 178 (citation and internal quotation marks omitted). The only FWS action that alters the legal regime is its issuance of a BiOp and incidental take statement. Id. Unlike the mandatory conditions in an incidental take statement, FWS's initial recommendations during emergency consultation have no legal consequences. It is within the Corps' discretion to implement FWS's recommendations as they deem appropriate. Importantly, the initial

26

conservation recommendations do not exempt the Corps or their permittee from any liability for a "take" of a protected species.  See Handbook ch.8.2(D). Because there is no final agency action, the Court concludes that the Plaintiffs are unlikely to succeed on the merits of their claim against FWS.

### 4.    Forest Service's Authorization of CSX's Activities

The Plaintiffs allege that the Forest Service's authorization of CSX's activities is inconsistent with applicable forest plans and therefore violates the NFMA and the APA.  [Doc. 36-1 at 21-23].

The Plaintiffs have failed to demonstrate that the Forest Service has taken a final agency action subject to judicial review.  To date, the Forest Service has not issued a special use authorization nor a determination that a special use authorization is not required for CXS's reconstruction activities. [Doc. 39-9: Decker Supp. Decl. at ¶ 2].  This is consistent with Forest Service regulations, which allow the temporary occupation of land in the case of emergencies prior to a special authorization or a determination that no authorization is required.  See 36 C.F.R. § 251.50(b).  As such, any Forest Service actions taken to date are merely of an "interlocutory nature" and not the "consummation" of the decisionmaking process.  Bennett, 520 U.S. at 177-78.

27

Because there is no final agency action, the Court concludes that the Plaintiffs are unlikely to succeed on the merits of their claim against the Forest Service on the merits of their NFMA claim.

**B.    Irreparable Harm**

The Plaintiffs' allegations of harm focus on the actions of CSX that are allegedly not compliant with NWPs. [Doc. 36-2 at 23-25].  However, the requested injunctive relief against the Agencies will not redress these concerns because the Plaintiffs have failed to demonstrate that CSX's authorizations do not comply with the required laws. Additionally, the Plaintiffs' claims of harm to their members are speculative, as they provided no concrete explanation of any irreparable harm that they would suffer absent an injunction.  A declarant's expressions of "worr[y]" about their personal life or financial well-being are not specific enough to establish irreparable harm. [See, e.g., Doc. 36-3: Schmidt Decl. at ¶¶ 16, 22; see also Doc. 36-16: McCombs Decl. at ¶¶ 14, 21].  The Plaintiffs' claims of possible harm to endangered species are also speculative and fail to take into account the pre-existing impacts on these species caused by Hurricane Helene and the subsequent recovery efforts.  [See Doc. 18-3: Mizzi Decl. at ¶ 5; Doc. 29-4: Elbert Decl. at ¶ 11].  Accordingly, the Court concludes that the Plaintiffs

have failed to demonstrate that irreparable harm will occur absent the requested injunctive relief.

### C. Balance of Equities and Public Interest

The third and fourth preliminary injunction factors "merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009).

Here, the Court finds that the public interest is best served by allowing the ongoing permitting processes and conferrals that the Agencies are undertaking with CSX to continue. Allowing the Agencies and CSX to continue close coordination will allow CSX to "repair and restore vital infrastructure" in North Carolina and Tennessee. [Doc. 24 at 4]. Further, enjoining these ongoing efforts will only serve to harm the public interest, by delaying the lawful emergency response to the devastation caused by Hurricane Helene.

## V. CONCLUSION

Upon careful consideration of the Plaintiffs' likelihood of success, the likelihood of irreparable harm, the balance of the equities, and the public interest, the Court concludes that preliminary injunctive relief is not warranted. Accordingly, the Court in its discretion denies the Plaintiffs' Motion for Preliminary Injunction.

# O R D E R

**IT IS, THEREFORE, ORDERED** that the Plaintiffs' Motion for Limited

Preliminary Injunction [Doc. 36] is **DENIED**.

**IT IS SO ORDERED.**

Signed: March 19, 2025

Martin Reidinger
Chief United States District Judge